**FARMERS' & MERCHANTS' BANK OF CATLETTSBURG, KY., v. FEDERAL RESERVE BANK OF CLEVELAND, OHIO, et al.**

(District Court, E. D. Kentucky. October 14, 1922.)

1. **Injunction ⊜⇒127—Past conduct not threatened in future held relevant as indicating purpose of threatened acts.**

   In a suit to enjoin a Federal Reserve Bank from presenting checks drawn upon a state bank over the latter's counter for cash payment, on the ground that the purpose was to coerce the state bank into clearing its checks at par, evidence of acts committed by a former agent of the Reserve Bank in making such collections is admissible to show the character and purpose of defendant's acts, though that agent was no longer employed, and there was no threat to continue in the future the wrongful acts committed by him.

2. **Banks and banking ⊜⇒288½, New, vol. IIA Key-No. Series—Reserve bank cannot present checks to state bank over the counter to coerce change in method of business.**

   Even though a Federal Reserve Bank has a legal right to present checks received by it over the counter of the state bank on which they were drawn for payment in cash, it cannot accumulate such checks and make demand for payment thereof in an unusual manner for the purpose of coercing the state bank into changing its method of doing business by agreeing to clear its checks at par.

3. **Banks and banking ⊜⇒288½, New, vol. IIA Key-No. Series—Evidence held to show Reserve bank was seeking to compel state bank to change method of doing business.**

   Evidence *held* to show that the course pursued by a Federal Reserve Bank in presenting checks drawn upon a state bank over the latter's counter for payment in cash was followed for the purpose of compelling the state bank to change its method of doing business by agreeing to clear its checks at par.

4. **Injunction ⊜⇒113—Delay in applying for relief held not to bar right.**

   A delay of a year and a half by a state bank in applying for an injunction to restrain a Federal Reserve Bank from presenting checks drawn on the state bank over its counter for payment in cash for the purpose of coercing the state bank into clearing its checks at par does not defeat its right to relief; the delay being explainable as due to a hope the practice would be discontinued, or as due to federal court decisions upholding such practice, which had been reversed by the Supreme Court shortly before the suit was brought.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by the Farmers' & Merchants' Bank of Catlettsburg, Ky., against the Federal Reserve Bank of Cleveland, Ohio, and another. On plaintiff's motion for preliminary injunction.   Motion sustained.

See, also, 286 Fed. 566.

Martin & Smith, of Catlettsburg, Ky., for plaintiff.

Worthington, Browning & Reed, of Maysville, Ky., and Squire, Sanders & Dempsey, of Cleveland, Ohio, for defendants.

COCHRAN, District Judge.   This cause is before me on plaintiff's motion for a preliminary injunction.

The plaintiff is a Kentucky corporation, doing a banking business at Catlettsburg, a city with a population of about 4,000, in this district.   It has a capital stock of $50,000, surplus of about $40,000, and deposits of about $500,000.   The defendant bank is a national corporation and is the Federal Reserve Bank for the Fourth District of the Federal Reserve System of the United States.   It has a branch bank in Cincinnati, Ohio, and plaintiff is in the Cincinnati Division of such district.   The individual defendant is a resident of Catlettsburg, and, at the time this suit was brought, to wit, July 15, 1921, was acting as the defendant bank's agent in the daily collection in cash over plaintiff's counter of checks drawn on it by its depositors, payable to persons at a distance from Catlettsburg, which had come into such defendant's hands and had been sent to her by the branch bank at Cincinnati for that purpose, and in the transmission of such cash to such branch bank by express or registered mail, and she had been so acting continuously since March 23, 1920.   The suit was originally brought in the state court in whose territorial jurisdiction Catlettsburg is. situated, and it was removed thence to this court upon the joint petition of the two defendants upon the ground that it arose under the Constitution and laws of the United States.   It is the plaintiff's practice, where such checks are sent to it through the mail for payment by other than one of its correspondent banks, to remit exchange on one of such banks and to charge not exceeding one-tenth of 1 per cent. of the amounts of the checks for so doing.   By sending such checks as come into its hands for collection by an agent in cash over the counter the defendant bank, though it incurs the expense of so doing, avoids having to pay such charges.   It had been advertising for a year and half that it would collect all such checks on plaintiff free of charge.   What plaintiff seeks to have enjoined is such conduct; i. e., the collection of such checks by defendants in this way and the advertisement by defendant bank that it will collect such checks free of charge.   It claims that it is injurious to it in that it deprives it of such charges, requires it to keep a greater reserve in cash than it would otherwise have to do, scandalizes it, affects its credit, and humilitates it.   A temporary restraining order was granted by the clerk of the state court when the suit was brought and has been in force ever since.   The case is of the same general character as that in the Northern district of Georgia covered by the decisions in American Bank & Trust Co. v. Reserve Bank of Atlanta (C. C. A.) 269 Fed. 4, 256 U. S. 350, 41 Sup. Ct. 499, 65 L. Ed. 983, and

(D. C.) 280 Fed. 940, and that in the district of Oregon covered by the decision in Brookings State Bank v. Federal Reserve Bank of San Francisco, 277 Fed. 430. Reference to these decisions relieves me, in presenting the case here, of doing more than calling attention to its particular facts and then proceeding to dispose of the question which it calls for decision. I will first state the facts as they appear from plaintiff's affidavits.

As early as January, 1918, the defendant bank began by letter to solicit the plaintiff to enter into a written agreement with it to remit exchange in payment of checks of the character stated at par—i. e., free of such charges. This it continued to do at intervals until December, 1919. The plaintiff not yielding to such solicitations at the time, it sent its traveling representative, H. A. Magee, who had in charge the matter of personally soliciting nonmember banks—i. e., state banking institutions—to enter into such agreements, to Catlettsburg, to interview plaintiff on the subject. He made four separate visits for that purpose. He first attempted persuasion, and, this failing, he insisted and demanded that plaintiff agree, and finally threatened it with the consequences of a refusal to do so. He said that the American Express Company would be employed to collect the checks in cash, which would be very embarrassing to plaintiff; that, though this would be expensive to the defendant bank, it did not matter, as there was a principle involved, and plaintiff would be mighty glad to sign up before long, as no bank could exist that did not; that the Federal Reserve System was like a mighty battleship coming up as it were from a smooth sea, and all banks that did not affiliate with it could not stand its swells and must get in its wake for safety, and that in the next five years there would be no small banks.

The plaintiff remaining recalcitrant, on January 6, 1920, the defendant bank employed the American Express Company to collect such checks as came into its hands, through its local agent at Catlettsburg. The checks would be delivered to the company at Cincinnati by the branch bank, carried to Catlettsburg, and there presented and payment in cash demanded by such agent, and upon receiving same he would carry it back to Cincinnati. The express company continued so to act until February 26, 1920, when it refused to do so any further. During this time Magee was in Catlettsburg from time to time looking after the matter and frequently visiting the bank. As the express agent would collect large sums in cash he would, shortly afterwards, come in the bank and see whether or not the method used had broken the spirit of those in charge and suggest that they submit to the desire of his principal that plaintiff go on the par list. About the middle of January, 1920, he asked the plaintiff's assistant cashier to use his influence with the cashier who was handling the matter on behalf of plaintiff, in an effort to have him agree to the par clearance method. He stated that, if they did not consent to it, the Federal Reserve Bank would continue its method of collection by the express company demanding cash at the counter, and that it would be annoying and expensive to both banks, and that plaintiff could not stand that method of paying items in cash. The reason

for the express company's refusal to act further was that the task was too burdensome.

Thereupon Magee went to Catlettsburg, and for several days, possibly until March 3, 1920, made the collections himself. Each day during this time he went to a drug store on the corner opposite plaintiff's bank, where there was a soda fountain, the most prominent place in the city, and remained there from three to five hours walking up and down in the storeroom and looking across the street at the bank as though he were on the watch for what was being done there. On that date he employed Frank K. Barbee, a resident of the city and night clerk in a hotel, to act as agent. He continued so to act until March 23, 1920, when he surrendered the job, and the defendant Miss McCall was employed. Whilst Barbee was acting as agent, Magee was in Catlettsburg the most of the time instructing him and overseeing the performance of his duties. The place of instruction was the corner drug store heretofore referred to. Magee spread the checks upon a refreshment table in the front part of the store in a conspicuous place where those coming in and out of the store could readily see and hear what was going on, assorted and listed and indorsed them, and explained to Barbee the details of presenting the checks at the counter and demanding payment in cash. Frequently he accompanied Barbee to the bank. He stated to Barbee that the reason and necessity for such method of collection was that the defendant bank insisted that the checks be cleared at par, and such was the only method whereby plaintiff would be forced to an agreement so to do, and that, though the method of collection was far more expensive to the defendant bank than the payment of the clearance fees, it was not the expense they cared about, but was simply the principle of the matter, and that sooner or later the plaintiff would be forced to sign an agreement to clear all checks at par or that it would be forced out of business. He gave to Barbee a number of pamphlets containing an exposition of the merits of universal par clearance and instructed him to call upon as many of plaintiff's depositors as he could see from time to time and leave one of those pamphlets with them.

After Miss McCall's appointment Magee remained in Catlettsburg for some time, possibly until April 10th, instructing her and overseeing the performance of her duties. The place of instruction and the manner thereof was exactly the same as in the case of Barbee. He also accompanied her to the bank frequently. It should be said that both Barbee and Miss McCall, at Magee's instance, inquired of plaintiff whether it was agreeable for them to act as such agent and were told that, if any one was to be employed to render the services, they might as well secure the position. Miss McCall was a maiden lady who had the respect of the people of Catlettsburg. Magee's manner whilst in and about plaintiff's bank, as heretofore set forth, was domineering, dictatorial, and boisterous. He sought opportunity to attract attention of those who might be in or near the bank by loud and quarrelsome conversation. He took occasion to create scenes and disturbances at times when there would be many customers in the lobby of the bank. At the time when he undertook to collect checks

after the express company quit plaintiff suggested that it had not received any letter designating him as agent. He made a row about this, intimating that it was refusing to recognize his authority. Much disturbance was caused in the bank by the colloquy over this matter. During Barbee's agency he brought on a heated argument with plaintiff's assistant cashier over a certain check.

Whilst the express company was acting as agent, plaintiff countered by stamping upon a great many of its blank checks furnished its depositors an indorsement in these words: "Payable in cash or exchange draft at the option of the Farmers' & Merchants' Bank of Catlettsburg, Ky." Up to February 19, 1920, the defendant bank accepted checks so indorsed, and when presented for payment exchange drafts were accepted. From February 19 to February 28, 1920, it refused to accept them. From February 28 to March 9, 1920, it again accepted them. Since then it has refused to do so. On February 28, 1920, Magee was acting as agent. He presented on that date 14 checks so indorsed, amounting to $573.80, and demanded and received 14 separate drafts, one for each check in payment thereof.

On March 10, 1920, during Barbee's agency, Magee visited C. C. Magann, who had the exclusive agency to handle and sell Ford cars at Ashland, Ky., a neighboring city, in the same county, and who was one of plaintiff's depositors at his place of business, introducing himself as a representative of defendant bank and stated that he wanted to discuss some business with him. Magann took him into his private office, and Magee then stated that his check to the Ford Motor Company of date March 8, 1920, for $3,756.72 on plaintiff had been presented and payment thereof refused, and exhibited a letter to him from the Cincinnati branch corroborating his statement. Magann immediately went to Catlettsburg in his automobile and ascertained that his check had been paid that day, and that it had not been presented for payment before then, and payment thereof had never been refused.

On March 26, 1920, during Miss McCall's agency, Magee visited C. H. Salyer another of plaintiff's depositors, who owned and operated a store in Catlettsburg. He stated in the presence of Salyer's customers in an abrupt, high-handed, and loud manner that he represented defendant bank, and, presenting a check drawn by him on plaintiff for $108.29 in favor of a Cincinnati party which possibly contained the indorsement as to payment heretofore referred to, demanded to know of Salyer why he had not filled the check out in a proper manner, and stated that he had presented it for payment and could not get any money on it.

On the same day he visited F. H. Carpenter, secretary of D. H. Carpenter & Co., engaged in wholesale and retail dry goods and notions business in Catlettsburg and a depositor of plaintiff, introduced himself as a Federal Reserve man, presented a check drawn by his company on plaintiff containing the indorsement referred to, inquired as to why his company permitted the bank to put such an indorsement upon the check, and stated that it was injurious to the credit

of his company, and that to save its credit it should do business with some other bank.

Magee, whilst in Catlettsburg, made inquiries of clerks in the drug store, post office, and express company's office as to where the plaintiff was getting its cash from. He also made inquiries as to the worth and standing of plaintiff and the men in charge of its business.

As stated, Magee left Catlettsburg about April 10, 1920. The reason for his leaving was that an indictment was returned against him by the state grand jury of the county in which that city is situated charging him with making and circulating statements derogatory to the plaintiff contrary to the Kentucky Statutes, and he has never been back since. He continued in the defendant bank's employ until July 17, 1920. Whilst he was in Catlettsburg he made reports of progress to the assistant cashier of defendant bank, who was overseeing the matter.

For a while after Miss McCall was employed it was her custom to go to the bank with a gocart in which to carry away from it the money received. Seemingly plaintiff purposely gave her more coin than she could otherwise carry. One day she was given as much as 94 pounds in silver. And at times it would wad the bills. Later on the gocart seems to have been abandoned, possibly because not needed. It took much time to wait upon her in counting the money, and after she was waited upon she took much time in recounting it, in separating it into separate denominations, and in making a list thereof, which she was required to do. She carried an instrument bearing defendant bank's seal which was used in sealing with lead a canvas sack in which the money was shipped. She always carried openly a pistol to protect herself from robbery and often was accompanied by one or two dogs.

After defendant bank refused to accept checks drawn on plaintiff bearing the indorsement as to payment in cash or exchange at plaintiff's option, it did not content itself with returning the checks to the banks from whom they came, but took pains to write to the payees of the checks, giving its reason for not accepting them. That was that the checks by reason of the indorsement were nonnegotiable. The concluding paragraph of each letter was:

"We are writing this letter in order that you may be advised that items bearing notation similar to that set forth on the check mentioned above are uncollectible through a Federal Reserve Bank and for that reason as a medium of payment the usefulness of such checks are impaired."

About two weeks before May 18, 1920, defendant bank's branch bank at Cincinnati wrote plaintiff's main Cincinnati correspondent, a national bank and member of the Federal Reserve System, a letter in which it said:

"We are instructed by the head office to refuse to handle checks bearing the endorsement of the Farmers' & Merchants' Bank of Catlettsburg. Accordingly in case any checks with their indorsement are deposited with us, by you, we shall return them. Please so instruct your transit department. This is effective at once and until further notice."

Whilst the American Express Company was acting as agent in January and February, 1920, its general agent at Cincinnati and local agent at Ashland, who had supervision of the Catlettsburg office, called upon the manager of the defendant bank's branch bank at Cincinnati to explain delay in two or three shipments of proceeds of checks collected by the express company. They inquired of the manager how long such method of collection would be kept up, and, according to the general agent, he replied:

"I do not know how long it will be continued, but it will be continued until the Farmers' & Merchants' Bank agrees to handle our collections without charge to us."

According to the local agent, he replied that they would continue their method of collecting checks over the counter until they had forced the plaintiff to handle them at par and intimated that it would not be long until it would be forced to clear at par.

Such is the showing in substance made by the affidavits introduced on behalf of plaintiff. As against it, so far as Magee's conduct is concerned, defendants have introduced the affidavit of Magee and the oral testimony of Miss McCall. In his affidavit Magee states that in his various conferences with plaintiff's cashier he never endeavored to coerce the plaintiff into agreeing to clear checks drawn on it at par, but at all times sought to point out to him that the par collection system was a great progressive movement in banking practice, and that plaintiff, as a representative banking institution in Catlettsburg, should give its sanction to this practice, and that he never uttered to any person any statement derogatory to the reputation or solvency of plaintiff. Other than these general statements, he makes no denial of the statements in plaintiff's affidavits as to his conduct. Possibly his affidavit is to be understood as stating that he was not in Catlettsburg any time whilst the express company was acting as agent. If so, this statement may be said to amount to an indirect denial of what is stated in plaintiff's affidavits as to his conduct in Catlettsburg at that time. Miss McCall testified that Mr. Magee was never boisterous or ungentlemanly in any way, and was always quiet and gentlemanly when she was thrown with him. There is no reason for not accepting this testimony as true. Possibly it can be reconciled with statements in plaintiff's affidavits by the fact that her presence had a restraining influence upon him. It is to be noted, however, that seemingly the indictment was not returned against him until over two weeks after Miss McCall began to act as agent. In the light of the showing made on both sides, I am constrained to accept that made by plaintiff as to Magee's conduct as being substantially true. It is hard to believe some of it—that as to his conduct in relation to Magann for instance. And a tendency to exaggerate seems to pervade plaintiff's affidavits. Yet with this said, in view of the number of them and the persons making them, all of whom are in good standing, I have no other recourse than that stated.

The defendant bank's assistant cashier, who has represented it in this matter, testified that the conduct of Magee complained of was

never authorized by the defendant bank, and, if he was guilty of any such conduct, it was absolutely unknown to it, and that he never intimated that he was doing anything at Catlettsburg except to carry out instructions which was to endeavor to persuade plaintiff to agree to remit at par and to treat it politely. At one time, however, a complaint of Magee was conveyed to defendant bank through the president of plaintiff's principal Cincinnati correspondent. Magee was instructed to see such president about it. He did so, and explained the matter to his satisfaction. The defendant bank learned of Magee's indictment and inquired of him about the matter. He gave an outline of his action whilst in Catlettsburg, and, according to that outline, there was nothing in his conduct which would indicate that the indictment was based upon well-established facts. But it made no independent investigation in regard to the matter, sent no one to Catlettsburg to inquire into Magee's conduct, made no effort to have the indictment against him brought to trial, expressed no regret to plaintiff for his conduct, if possibly he did go too far, and continued to keep him in its employ until July 17, 1920; the reason for his then quitting not appearing.

[1] Seemingly the defendant bank would have the court, in disposing of this motion, turn its back on Magee's conduct as a thing long of the past when this suit was brought and view it in the light of the fact that at that time all it had to apprehend was Miss McCall's daily visits, with her pistol by her side, accompanied at times with one or two dogs. But that conduct is relevant, notwithstanding that such is all that plaintiff has reason to apprehend in the future. It gives color to defendant bank's purpose in initiating and continuing this procedure directed against plaintiff. Possibly it may be true that it was not aware of Magee's conduct, at least to the full extent to which he went. But how is such conduct on Magee's part to be accounted for? It cannot be accounted for on any other basis than knowledge on his part of what defendant bank's purpose was in setting on foot the movement against plaintiff. It was begotten by such purpose, and hence gives color to it.

The showing made by plaintiff's affidavits as to the other particulars than Magee's conduct and as to his conduct except as stated are uncontradicted.

[2] The facts as to two other matters should be stated. One of them is as to the accumulation of plaintiff's checks by defendant bank. There was no other accumulation than such as was caused by its advertisement that it would collect plaintiff's checks at par. This necessarily resulted in an accumulation to some extent. It can be accepted that this undertaking was availed of by all in whose hands plaintiff's checks came who otherwise would have been compelled to pay for remittances in payment thereof. And because of this plaintiff was obliged to keep a greater reserve than would have been the case had the checks been allowed to straggle in one at a time, as they did before defendant bank set on foot the movement against it. The other is as to the effect on plaintiff of defendant bank's course of procedure. It deprived it of income from remittances to the extent of from

$800 to $1,000 a year. It required it to keep a greater cash reserve, and therefore affected its income from loans to a certain extent. It caused it to lose depositors. There was shrinkage in deposits in the time between the initiation of the movement and just before the bringing of this suit of nearly $100,000. But it cannot be said from this mere fact alone that this shrinkage was caused by that movement. There was a greater shrinkage in the same time of the deposits of another banking institution in Catlettsburg. But the cashier's affidavit gives the names of seven depositors which plaintiff lost for this reason, and this statement is uncontradicted. And the movement, especially whilst Magee was in Catlettsburg, was calculated to cause plaintiff to lose depositors. The movement scandalized plaintiff in Catlettsburg and was calculated to injure its reputation and credit. What was going on was a matter of public notoriety. No attempt was made to keep it from the public. The effort was all the other way, to bring it to the knowledge of the public. And the procedure could not help being humiliating to plaintiff.

Yet still another fact should be stated in order to a full presentation of this case. That is that when this suit was brought the checks which came into defendant bank's hands for collection and which were presented by it for payment over the counter were dwindling in number. At the time the movement was begun plaintiff had reason to expect that checks amounting to as much as $8,000 might be presented for payment at any time. At the time suit was brought the reasonable expectation did not exceed $3,700. This shrinkage was due to the indorsement on its checks, which were increasingly put there, to the effect that payment might be made in cash or exchange which checks the defendant bank refused to handle.

It remains to determine the law of this case. As to this there can be no question, as it has been settled by the decision of the Supreme Court in the Atlanta Case. It all depends on defendant bank's purpose in adopting this unusual and heretofore unheard of procedure of seeking out plaintiff's checks for collection and presenting them in a body for payment over the counter—i. e., what was its immediate purpose in so doing. Was it for the purpose of breaking down the plaintiff's business as then conducted? If so, it was unlawful and subject to be restrained by a court of equity. It does not follow that, because the holder of a check has a right to present it to the bank upon which it is drawn for payment over the counter, one has the right to seek to become the holder of all the checks drawn on a bank as they are drawn and then present them in a body for payment in cash over the counter. If such was defendant bank's immediate purpose in so doing, it was not justified by the ulterior purpose which it had in view, to wit, of freeing commerce from the burden of such charges. Here, as never, did the end justify the means. Such a course of procedure is a kind of refined bank holdup. It is one of the inalienable rights of a person to be unprogressive, selfish and even mean. This is said without intending to so characterize plaintiff's position. No other person has the right to coerce him into being otherwise. The idea that there is such a right was at the bottom of the night rider troubles

in Kentucky some years ago. Those who were in the pool thought that those who were out were selfish. And they undertook to coerce them into joining the pool by shooting into their homes.

[3] What, then, was the defendant bank's purpose in initiating this movement against plaintiff and keeping it up for over a year and a half—i. e., until stopped from further doing so by the temporary restraining order? There is but one answer to this question, and that is that it was to break down plaintiff's business as it was being conducted, not to put it out of business, but to compel it to do business in this particular as it would have it do, and not as plaintiff desired. Notwithstanding it was having its way in conducting its business, it was not willing that plaintiff should have its way in conducting its business. It desired to impose its will on plaintiff. That such was defendant bank's purpose is the meaning of the course of procedure adopted. It can be accounted for on no other basis. Such a purpose was avowed by those acting on its behalf. And it was admitted on the witness stand by its assistant cashier that, if the plaintiff at any time had signed an agreement to remit at par, the agency would have been withdrawn. Each side appeals to the decision in the Oregon case as favoring its contention. It seems to me to favor that of plaintiff. In that case the Reserve Bank had been maintaining an agent at Brookings, but at the time of the application for preliminary injunction that agent had been withdrawn, and the Reserve Bank had been forwarding to the state bank checks drawn on it, indorsing them for collection only and remittance in full without deduction for exchange, and, upon the state bank returning them unpaid, had been returning them to its correspondents, advising them that the state bank refused to pay and had not protested same, and they must look to the state bank for their protection, which was in effect that the checks had been dishonored. A preliminary injunction was granted restraining the Reserve Bank from so advising its customers. In the decision of Judge Wolverton on which the defendant bank relies is his statement that the Reserve Bank was acting within its authority in maintaining an agent at Brookings for making collections over the counter of plaintiff's bank and paying the expenses thereof. But in making this statement he was merely referring to the corporate power of the Reserve Bank, and he based this on the decision in the Atlanta Case. He was not considering the right of the Reserve Bank to so act as against the state bank. On the contrary, he seemingly condemns the action of the Reserve Bank in this particular as well as in the particular as to which the injunction was granted. He said:

"The question remains for determination as it respects the motive that induced the defendant bank to pursue the course it did in attempting to make collection from the plaintiff bank. It appears by defendant's answer that it expended $1,915.32 in making collections, over the counter of plaintiff's bank, of $102,850.33, during the year from October 1, 1920, to October 1, 1921. The method employed, considering the occasion for it, or rather the lack of reasonable necessity, was, to say the least, extraordinary, extravagant, and unbusinesslike."

Again he said:

"I am persuaded, however, that the action of the defendant bank in adopting the methods pursued by it toward the plaintiff bank, and in persistently

adhering to them, indicates most convincingly that it was for the purpose of coercing the latter bank into adopting the policy of the Reserve Bank to remit at par. Although the policy may be commercially sound, the plaintiff was entitled to pursue its own method, without being harrassed and annoyed because it persisted in so doing."

It is not unlikely that the withdrawal of the agent from Brookings was due to the decision of the Supreme Court in the Atlanta Case and was an interpretation of that decision as condemning such action.

The decision of Judge Evans in the Atlanta Case after its return consists of certain findings in that case, based upon its particular facts. In so far as such findings may conflict with what I have held herein, I am unable to follow it.

[4] The only thing that has given me any concern in this case is plaintiff's delay in asserting its rights. No explanation is given of this. Possibly it thought that it would be able to wear out the defendant bank in the long run. But it is not unlikely that under the influence of the decision of the lower courts in the Atlanta Case it thought that the defendant bank had the right to make the collections as it did, and was not advised to the contrary until the Supreme Court reversed those decisions. It was shortly after such reversal that this suit was brought. I cannot, however, make out from this delay any reason why defendant bank should be permitted to continue to make collections in this unlawful manner. The motion, therefore, is sustained. A preliminary injunction is granted restraining defendants from continuing so to make collections of checks drawn on plaintiff and the defendant bank from advertising that it will collect such checks free of charge and from doing anything else for the purpose of coercing plaintiff to remit at par.