FARMERS AND MERCHANTS BANK OF MONROE, NORTH CAROLINA, ET AL. v. FEDERAL RESERVE BANK OF RICHMOND, VIRGINIA.

CERTIORARI TO THE SUPREME COURT OF THE STATE OF NORTH CAROLINA.

No. 823. Argued April 30, May 1, 1923.—Decided June 11, 1923.

1. Many state banks, in satisfying checks drawn upon them by their depositors and sent through other banks for collection, were accustomed to remit by draft on their reserves elsewhere and to make a small charge, called exchange, deducted from the remittance. The Federal Reserve Board, and the federal reserve banks, being forbidden to pay exchange charges, but believing it their duty to accept checks on any bank for collection and to make par clearance and collection of checks universal throughout the United States, adopted the practice of causing checks drawn on state banks which refused par clearance to be presented to such banks at the counter for payment in cash. To protect North Carolina banks from serious loss of income which would ensue from this practice, both through reduction of exchange charges and through transference of income-producing assets to their vaults, the legislature of that State enacted, (Pub. Laws 1921, c. 20) that any check drawn

upon a local bank (other than checks in payment of obligations to the federal or state governments,) unless specified to the contrary on its face by the maker, should be payable, at the option of the drawee, in exchange drawn on the drawee's reserve deposits, when such check was presented by or through any federal reserve bank, postoffice, or express company, or their agents, and, further, that state banks might charge a fee, within specified limits, on remittances covering checks. *Held:*

(a) That the North Carolina Act does not violate the provision of the Federal Constitution, Art. I, § 10, cl. 1, which prohibits a State from making anything except gold and silver coin a tender in payment of debts. P. 659.

(b) That it does not deprive the respondent Federal Reserve Bank, without due process of law, of its right to engage in the business of collecting checks payable on presentation within its district, (which it claims it may make a source of revenue), nor of its liberty of contract, by compelling it to accept payment in drafts, good or bad, and so driving it from that branch of business. The statute is not to be construed as authorizing payment in bad drafts, and is an exercise of police power not offensive to the due process clause. P. 660.

(c) That it does not deprive the Federal Reserve Bank of equal protection of the laws, by obliging it to accept payment in drafts, while leaving other banks free to demand cash; since it was reasonable classification for the legislature to limit the regulation to the particular, existing condition sought to be remedied. P. 661.

(d) That it does not conflict with duties imposed by Congress on the Federal Reserve Board and the federal reserve banks. P. 662.

2. Neither § 13, nor any other provision of the Federal Reserve Act, imposes on reserve banks any obligation to receive for collection checks for which it is impossible to obtain payment except by incurring serious expense, as by presenting them by special messenger at a distant place. P. 662.

3. In declaring that reserve banks may receive checks on non-member banks "payable on presentation", the Federal Reserve Act, § 13, as amended, would seem to imply that the checks must be payable in cash, or in such funds as are deemed by the reserve bank an equivalent. P. 663.

4. The federal reserve legislation does not impose on the Federal Reserve Board or the federal reserve banks a duty to establish in the United States a universal system of par clearance and collection of checks. P. 664.

5. The contention that Congress imposed this duty is irreconcilable with the provision of the Hardwick Amendment to § 13 (Act of June 21, 1917, c. 32, § 4, 40 Stat. 232) allowing members and affiliated non-members to make a limited charge (except to federal reserve banks) for " payment of checks and . . . remission therefor by exchange or otherwise." P. 666.

6. The Hardwick Amendment in no way interferes with the right of a depositor in a non-affiliated state bank to agree with his bank that his checks in certain cases (unless otherwise indicated on their face) should be payable, at its option, by exchange. P. 667.

183 N. Car. 546, reversed.

CERTIORARI to a decree of the Supreme Court of North Carolina reversing a decree which perpetually' enjoined the respondent Federal Reserve Bank from refusing to accept payment of checks on petitioner banks in exchange drafts, as permitted by a North Carolina statute, and from returning, as dishonored, checks for which payment had been tendered only in that way.

*Mr. Alexander W. Smith* and *Mr. John J. Parker,* with whom *Mr. Gillam Craig* was on the brief, for petitioners.

*Mr. John W. Davis* and *Mr. Henry W. Anderson,* with whom *Mr. M. G. Wallace, Mr. H. G. Connor, Jr.,* and *Mr. C. W. Tillett, Jr.,* were on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The Legislature of North Carolina provided by § 2 of c. 20, Public Laws of 1921, entitled "An Act to promote the solvency of state banks ":

" That in order to prevent accumulation of unnecessary amounts of currency in the vaults of the banks and trust companies chartered by this State, all checks drawn on said banks and trust companies shall, unless specified on the face thereof to the contrary by the maker or makers thereof, be payable at the option of the drawee bank, in exchange drawn on the reserve deposits of said drawee

bank when any such check is presented by or through any Federal Reserve Bank, postoffice, or express company, or any respective agents thereof."

Section 1 authorizes banking institutions chartered by the State to charge a fee not in excess of one-eighth of one per cent. on remittances covering checks, the minimum fee on any remittance therefor to be ten cents. Section 4 exempts from the operation of §§ 1 and 2 all checks drawn in payment of obligations to the federal or the state government. Whether this statute conflicts with § 13 of the Federal Reserve Act (December 23, 1913, c. 6, 38 Stat. 251, 263; as amended September 7, 1916, c. 461, 39 Stat. 752; June 21, 1917, c. 32, § 4, 40 Stat. 232, 234) or otherwise with the Federal Constitution is the question for decision.

The legislation arose out of the effort of the Federal Reserve Board to introduce in the United States universal par clearance and collection of checks through federal reserve banks. See *American Bank & Trust Co.* v. *Federal Reserve Bank of Atlanta,* 256 U. S. 350. The Federal Reserve Bank of Richmond serves the Fifth Federal Reserve District which includes North Carolina. Upon the enactment of this statute the bank gave notice that it considered the legislation void under the Federal Constitution; that, when presenting checks to North Carolina state banks for payment over the counter, it would refuse to accept exchange drafts on reserve deposits as required by § 2; and that it would return as dishonored checks for which only exchange drafts had been tendered in payment. Some checks were returned thus dishonored; and to enjoin such action, this suit was brought in a court of the State by the Farmers and Merchants Bank of Monroe and eleven other state banks. Two hundred and seventy-one more joined later as plaintiffs. So far as appears, none of them was a member of the federal reserve system or was affiliated with it. The trial court granted a per-

petual injunction. The Supreme Court of the State reversed the decree, 183 N. Car. 546; and the case is here on writ of certiorari, 261 U. S. 610. Defendant admits that, if the North Carolina statute is constitutional, plaintiffs are entitled to an injunction.

To understand the occasion for the statute, its operation and its effect, the applicable banking practice must be considered.[1] Par clearance does not mean that the payee of a check who deposits it with his bank for collection will be credited in his account with the face of the check if it is collected. His bank may, despite par clearance, make a charge to him for its service in collecting the check from the drawee bank. It may make such a charge although both it and the drawee bank are members of the federal reserve system; and some third bank which aids in the process of collection may likewise make a charge for the service it renders. Such a collection charge may be made not only to member banks by member banks, national or state, but it may be made to member banks also by the federal reserve banks for the services which the latter render. The collection charge is expressly provided for in § 16 of the Federal Reserve Act (38 Stat. 268) which declares that:

" The Federal Reserve Board shall, by rule, fix the charges to be collected by the member banks from its patrons whose checks are cleared through the Federal reserve bank and the charge which may be imposed for the service of clearing or collection rendered by the Federal reserve bank."

---

[1] See Annual Reports of the Federal Reserve Board, 1914, pp. 19, 20, 174; 1915, pp. 14–17; 1916, pp. 9–12; Regulation I, Series of 1916, p. 169; 1917, pp. 23, 24; Regulation J, Series of 1917, pp. 181–183; 1918, pp. 74–77; 204–206; 810, 811, 817, 821; 1919, pp. 40–44; 222–228; 1920, pp. 63–69; 1921, 68–73; 228–230; Letter from the Governor of the Federal Reserve Board of January 26, 1920, Senate Document No. 184, 66th Cong., 2d sess.; also " Par Clearance of Checks," by C. T. Murchison, 1 No. Car. Law Review 133.

Par clearance refers to a wholly different matter. It deals not with charges for collection, but with charges incident to paying. It deals with exchange. Formerly, checks, except where paid at the banking house over the counter, were customarily paid either through a clearing house or by remitting, to the bank in which they had been deposited for collection, a draft on the drawee's deposit in some reserve city. For the service rendered by the drawee bank in so remitting funds available for use at the place of the deposit of the check, it was formerly a common practice to make a small charge, called exchange, and to deduct the amount from the remittance. This charge of the drawee bank the Federal Reserve Board planned to eliminate and, in so doing, to concentrate in the twelve federal reserve banks the clearance of checks and the accumulation of the reserve balances used for that purpose. The Board began by efforts to induce the banks to adopt par clearance voluntarily.[2] The attempt was not successful. The Board then concluded to apply compulsion. Every national bank is necessarily a member of the federal reserve system; and every state bank with the requisite qualifications may become such. Over members the Board has large powers, as well as influence. The first step in the campaign of compulsion was taken in the summer of 1916, when the Board issued a regulation requiring every drawee bank which is a member of the federal reserve system to pay without deduction, all checks upon it presented through the mail by the federal reserve bank of the district. The operation of this requirement was at first limited in scope by the fact that the original act (§ 13) authorized the reserve banks to collect only those checks which were drawn on member banks and which were deposited by a member bank or another reserve

[2] See Report, Federal Reserve Board, 1915, pp. 14–17; ibid, 1916, pp. 9–11.

bank or the United States. Few of the many state banks had then elected to become members. In September, 1916, § 13 was amended so as to authorize a reserve bank to receive for collection from any member (including other reserve banks) also checks drawn upon non-member banks within its district. Thereby, the Federal Reserve Board was enabled to extend par clearance to a large proportion of all checks issued in the United States. But the regulation (J) then issued expressly provided that the federal reserve banks would receive from member banks, at par, only checks on those of the non-member banks whose checks could be collected by the federal reserve bank at par. It was recognized that non-members were left free to refuse assent to par clearance. By December 15, 1916, only 37 of the state banks within the United States, numbering about 20,000, had become members of the system; and only 8,065 of the state banks had assented to par clearance.

Reserve banks could not, under the then law, make collections for non-members. It was believed that if Congress would grant federal reserve banks permission to make collection also for non-members, the Board could offer to all banks inducements adequate to secure their consent to par clearance. A further amendment to § 13 was thereupon secured by Act of June 21, 1917, c. 32, § 4, 40 Stat. 232, 234, which provided, among other things, that federal reserve banks:

"Solely for the purposes of exchange or of collection, may receive from any nonmember bank . . . deposits of . . . checks . . . payable upon presentation . . . .: *Provided,* Such nonmember bank . . . maintains with the Federal reserve bank of its district a balance sufficient to offset the items in transit held for its` account by the Federal reserve bank."

To this provision, which embodied the legislation proposed by the Federal Reserve Board, there was added,

while in the Senate, another proviso, relating to the ex-
change charge, now known in a modified form as the
Hardwick Amendment, which declares:

" That nothing in this or any other section of this Act
shall be construed as prohibiting a member or nonmem-
ber bank from making reasonable charges, to be deter-
mined and regulated by the Federal Reserve Board, but
in no case to exceed 10 cents per $100 or fraction thereof,
based on the total of checks and drafts presented at any
one time, for collection or payment of checks and drafts
and remission therefor by exchange or otherwise; but no
such charges shall be made against the Federal reserve
banks."

Thus a federal reserve bank was authorized to receive
for collection checks from non-members who maintained
with it the prescribed balance; and strenuous efforts were
then made to induce all state banks to so arrange. But
the law did not compel state banks to do this. Many
refused; and they continued to insist on making exchange
charges. On March 21, 1918, the Attorney General, 31
Ops. Atty. Gen. 245, 251, advised the President:

" The Federal reserve act, however, does not command
or compel these State banks to forego any right they
may have under the State laws to make charges in con-
nection with the payment of checks drawn upon them.
The act merely offers the clearing and collection facilities
of the Federal reserve banks upon specified conditions.
If the State banks refuse to comply with the conditions
by insisting upon making charges against the Federal re-
serve banks, the result will simply be, so far as the Fed-
eral Reserve Act is concerned, that since the Federal re-
serve banks can not pay these charges they can not clear
or collect checks on banks demanding such payment
from them."

The Federal Reserve Board and the federal reserve
banks were thus advised that they were prohibited from

paying an exchange charge to any bank. But they believed that it was their duty to accept for collection any check on any bank; and that Congress had imposed upon them the duty of making par clearance and collection of checks universal in the United States. So they undertook to bring about acquiescence of the remaining state banks to the system of par clearance.[3] Some of the nonassenting state banks made stubborn resistance.[4] To overcome it the reserve banks held themselves out as prepared to collect at par also checks on the state banks which did not assent to par clearance. This they did by publishing a list of all banks from whom they undertook to collect at par, regardless of whether such banks had agreed to remit at par or not. This resulted in drawing to the federal reserve banks for collection the large volume of checks which theretofore had come to the drawee bank by mail from many sources and which had been paid by remittances drawn on the bank's balance in some reserve city. If a state bank persisted in refusal to remit at par, the reserve banks caused these checks to be presented, at the drawee bank, for payment in cash over the counter. The practice adopted by the reserve banks would, if pursued, necessarily subject country banks to serious loss of income. It would deprive them of their income from exchange charges; and it would re-

---

[3] North Carolina was placed on the par list on November 15, 1920. There were on January 1, 1921, in the United States, 30,523 banks, state and national. Of these 1,755 state banks had refused to enter the par list. About 250 of the banks so refusing were in North Carolina. During the year 1921 the number which refused to consent to par clearance increased to 2,353. Annual Report of Federal Reserve Board, 1921, p. 71.

[4] See *American Bank & Trust Co.* v. *Federal Reserve Bank of Atlanta, supra; Brookings State Bank* v. *Federal Reserve Bank of San Francisco*, 277 Fed. 430; 281 Fed. 222; *Farmers' & Merchants' Bank of Catlettsburg, Ky.* v. *Federal Reserve Bank of Cleveland*, 286 Fed. 610.

duce their income-producing assets by compelling them to keep in their vaults in cash a much larger part of their resources than theretofore. That such loss must result was admitted. That it might render the banks insolvent was clear. But the federal reserve banks insisted that no alternative was left open to them, since they had to collect the checks and were forbidden to pay exchange charges. The state banks denied that the federal reserve banks were obliged to accept these checks for collection; and insisted that federal reserve banks should refrain from accepting for collection checks on banks which did not assent to par clearance.

It was to protect its state banks from this threatened loss, which might disable them, that the legislature of North Carolina enacted the statute here in question.[5] It made no attempt to compel the federal reserve bank to pay an exchange charge. It made no attempt to compel a depositor to accept something other than cash in payment of a check drawn by him. It merely provided that, unless the drawer indicated by a notation on the face of the check that he required payment in cash, the drawee bank was at liberty to pay the check by exchange drawn on its reserve deposits. Thus the statute merely sought to remove (when the drawer acquiesced) the absolute requirement of the common law that a check presented at the bank's counter must be paid in cash. It gave the drawee bank the option to pay by exchange only in certain cases; namely, when the check was "presented by or through any Federal Reserve Bank, postoffice, or ex-

---

[5] Statutes similar in purpose were enacted in Alabama, Florida, Georgia, Louisiana, Mississippi, South Dakota and Tennessee. See Annual Report of Federal Reserve Board, 1921, p. 70; Alabama, Gen. & Loc. Acts, 1920, No. 35; Florida, Laws, 1921, c. 8532; Georgia, Laws, 1920, p. 107; Louisiana, Acts, 1920, No. 23; Mississippi, Laws, 1920, c. 183; South Dakota, Laws, 1921, c. 31; Tennessee, Pub. Acts, 1921, c. 37.

press company, or any respective agents thereof." The option was so limited, because the only purpose of the statute was to relieve state banks from the pressure which, by reason of the common-law requirement, federal reserve banks were in a position to exert and thus compel submission to par clearance. It was expected that depositors would coöperate with their banks and refrain from making the prescribed notation; and that when the reserve banks were no longer in a position to exert pressure by demanding payment in cash, they would cease to solicit, or to receive, for collection checks on non-assenting state banks. Thus, these would be enabled to earn exchange charges as theretofore. Such was the occasion for the statute and its purpose. Whether this legislative modification of the common-law rule which requires payment in cash violates the Federal Constitution is the question for decision. That it does is asserted on five grounds.

*First.* It is contended that in authorizing payment of checks by draft on reserve deposits § 2 violates the provision of Article I, § 10, cl. 1, of the Federal Constitution, which prohibits a State from making anything except gold and silver coin a tender in payment of debts. This claim is clearly unfounded. The debt of the bank is solely to the depositor. The statute does not authorize the bank to discharge its obligation to its depositor by an exchange draft. It merely provides that, unless the depositor in drawing the check specifies on its face to the contrary, he shall be deemed to have assented to payment by such a draft. There is nothing in the Federal Constitution which prohibits a depositor from consenting, when he draws a check, that payment may be made by a draft. And, as the statute is prospective in its operation, *Denny* v. *Bennett*, 128 U. S. 489; *Abilene National Bank* v. *Dolley*, 228 U. S. 1, 5, there is no constitutional obstacle to a State's providing that, in the absence of

dissent, consent shall be presumed. Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge. See *Ogden* v. *Saunders,* 12 Wheat. 213, 231; *Von Hoffman* v. *Quincy,* 4 Wall. 535, 550. If, therefore, the provision of § 2 authorizing payment by exchange draft is otherwise valid, it is binding upon the drawer of the check. Since it binds the drawer, it binds the payee and every subsequent holder, whether he be a citizen of North Carolina or of some other State, and wherever the transfer of the check was made. *Brabston* v. *Gibson,* 9 How. 263. For the holder of a check has, in the absence of acceptance by the drawee bank, no independent right to require payment under the general law. *Bank of The Republic* v. *Millard,* 10 Wall. 152. He takes it subject to the construction and with rights conferred by the laws of North Carolina, the place of the bank's contract and of performance. *Pierce* v. *Indseth,* 106 U. S. 546. Compare *Rouquette* v. *Overmann,* L. R. 10 Q. B. 525.

*Second.* It is contended that § 2 violates the due process clause. The argument is that defendant is a federal corporation authorized to engage in the business of collecting checks payable upon presentation within the district, a business common to all banking institutions; that the right to engage in this branch of the business is a valuable property right; that while defendant has, in the past, not made any charge for such collections, it has the right to do so, and could make this branch of its business an important source of revenue; that to compel defendant to accept in payment of checks exchange drafts on reserve deposits, whether good or bad, deprives it of liberty of contract, and in effect of an important branch

of its business, since that of collecting checks cannot be conducted under such limitations. To this argument the answer is clear. The purpose of the statute, as its title declares, was to promote the solvency of state banks. We should, in the absence of controlling decision of the highest court of the State to the contrary, construe the statute not as authorizing payment in a "bad" draft, but as authorizing payment in such exchange drafts only as had customarily been used in remitting for checks. So construed the statute is merely an exercise of the police power, by which the banking business is regulated for the purpose of protecting the public, and promoting the general welfare. *Noble State Bank* v. *Haskell,* 219 U. S. 104, 575. The regulation here attempted is not so extreme as inherently to deny rights protected by the due process clause. Compare *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549, 567, 568; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157, 162. If the regulation exceeds the State's power to protect the public, it must be because some other provision of the Federal Constitution is violated by the means adopted or by the manner in which they are applied.

*Third.* It is contended that the statute is obnoxious to the equal protection clause. The argument is that the Federal Reserve Bank of Richmond is obliged to accept payment in exchange drafts, whereas other banks with whom it might conceivably compete may demand cash, except in those cases where they present the check through an express company or the postoffice. It is well settled that the legislature of a State may (in the absence of other controlling provisions) direct its police regulations against what it deems an existing evil, without covering the whole field of possible abuses. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 81; *Missouri Pacific Ry. Co.* v. *Mackey,* 127 U. S. 205. If the legislature finds that a particular instrument of trade war is being used

against a policy which it deems wise to adopt, it may direct its legislation specifically and solely against that instrument. *Central Lumber Co.* v. *South Dakota, supra,* p. 160. If it finds that the instrument is used only under certain conditions, or by a particular class of concerns, it may limit its prohibition to the conditions and the concerns which it concludes alone menace what it deems the public welfare. The facts recited above disclose ample ground for the classification made by the legislature. Hence, there was no denial of equal protection of the law. There remains to consider whether § 2 exceeds the State's power, because Congress has imposed specifically upon federal reserve banks duties, the performance of which § 2 obstructs; and that in this way, it conflicts with the Federal Reserve Act. This is the ground on which the invalidity of the North Carolina act has been most strongly assailed.

*Fourth.* One contention is that § 2 conflicts with the Federal Reserve Act because it prevents the federal reserve banks from collecting checks of such state banks as do not acquiesce in the plan for par clearance. The argument rests on the assumption that the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank, if such check is payable upon presentation; and is obliged to collect the same at par without allowing deductions for exchange or other charge. But neither § 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection. The act merely confers authority to do so. The class of cases to which such authority applies was enlarged from time to time by Congress. But in each amendment, as in § 13, the words used were " may receive "—words of authorization merely. It is true that in statutes the word " may " is sometimes construed as " shall ". But that is where the context, or the subject-matter, compels

such construction. *Supervisors* v. *United States,* 4 Wall. 435. Here it does not. This statute appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the Board and the reserve banks "shall" do and what they "may" do.[6]

Moreover, even if it could be held that the reserve banks are ordinarily obliged to collect checks for authorized depositors, it is clear that they are not required to do so where the drawee has refused to remit except upon allowance of exchange charges which reserve banks are not permitted to pay. There is surely nothing in the act to indicate that reserve banks must undertake the collection of checks in cases where it is impossible to obtain payment except by incurring serious expense; as, in presenting checks by special messenger at a distant point. Furthermore, the checks which the act declares reserve banks may receive for collection are limited to those "payable on presentation." The expression would seem to imply that the checks must be payable either in cash or in such funds as are deemed by the reserve bank to be

---

[6] In the original Federal Reserve Act (38 Stat. 251) "may" is used in §§ 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 21, 22, 24, 25, 26, 28. "Shall" is used in those sections and also in §§ 1, 6, 7, 20, 23, 27, 29. Thus: Sec. 2: "The Secretary . . . shall designate . . . cities to be known as Federal reserve cities, and shall divide the continental United States . . . into districts. . . . The districts . . . may be readjusted. . . . Such districts shall be known as Federal reserve districts and may be designated by number"; Sec. 3: "Each Federal reserve bank shall establish branch banks within the Federal reserve district in which it is located and may do so in the district of any Federal reserve bank which may have been suspended"; Sec. 5: "outstanding capital stock shall be increased . . . as member banks increase their capital stock . . . and may be decreased as member banks reduce their capital stock . . . "; Sec. 13: " . . . may receive . . . deposits . . . may discount . . . shall at no time exceed"; Sec. 16: "Every Federal reserve bank shall maintain reserves . . . "; "Every Federal reserve bank shall receive on deposit."

an equivalent. A check payable at the option of the drawee by a draft on distant reserves would seem not to be within the limited class of checks referred to in the act. The argument for the Federal Reserve Bank is not helped by reference to the incidental power conferred by § 4. It is only "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this [the Federal Reserve] Act" which are granted. No duty or right of the federal reserve bank to collect checks is obstructed by the North Carolina statute which merely gives to the drawee bank the right to pay in the customary exchange draft, where its depositor has, by the form used in drawing the check, consented that this be done.

*Fifth.* The further contention is made that § 2 conflicts with the Federal Reserve Act because it interferes with the duty of the Federal Reserve Board to establish in the United States a universal system of par clearance and collection of checks. Congress did not in terms confer upon the Federal Reserve Board or the federal reserve banks a duty to establish universal par clearance and collection of checks; and there is nothing in the original act or in any amendment from which such duty to compel its adoption may be inferred. The only sections which in any way deal either with clearance or collection are 13 and 16. In neither section is there any suggestion that the Reserve Board and the reserve banks shall become an agency for universal clearance. On the contrary § 16 strictly limits the scope of their clearance functions. It provides that the Federal Reserve Board: "may at its discretion exercise the functions of a clearing house for such Federal reserve banks . . . and may also require each such bank to exercise the functions of a clearing house for its member banks."

There is no reference whatever to "par" in § 13, eitner as originally enacted or as amended from time to time.

There is a reference to " par " in § 16; and it is so clear and explicit as to preclude a contention that it has any application to non-member banks; or to the ordinary process of check collection here involved. Section 16 (38 Stat. p. 268) declares:

" Every Federal reserve bank shall receive on deposit at par from member banks or from Federal reserve banks checks and drafts drawn upon any of its depositors, and when remitted by a Federal reserve bank, checks and drafts drawn by any depositor in any other Federal reserve bank or member bank upon funds to the credit of said depositor in said reserve bank or member bank. Nothing herein contained shall be construed as prohibiting a member bank from charging its actual expense incurred in collecting and remitting funds, or for exchange sold to its patrons."

The depositors in a federal reserve bank are the United States, other federal reserve banks, and member banks. It is checks on these depositors which are to be received by the federal reserve banks. These checks from these depositors the federal reserve banks must receive. And when received they must be taken at par. There is no mention of non-member banks in this section. When, in 1916, § 13 was amended to permit federal reserve banks to receive from member banks solely for collection other checks payable upon presentation within the district;— and when, in 1917, § 13 was again amended to permit such receipt solely for collection also from certain non-member banks—§ 16 was left in this respect unchanged. In other respects § 16 was amended both by the Act of 1916 and by the Act of 1917. The natural explanation of the omission to amend the provision in § 16 concerning clearance is that the section has no application to non-member banks,—even if affiliated.

Moreover, the contention that Congress has imposed upon the Board the duty of establishing universal par

clearance and collection of checks through the federal
reserve banks is irreconcilable with the specific provision
of the Hardwick Amendment which declares that even a
member or an affiliated non-member may make a limited
charge (except to federal reserve banks) for "payment
of checks and . . . remission therefor by exchange or
otherwise." The right to make a charge for payment of
checks, thus regained by member and preserved to affil-
iated non-member banks, shows that it was not intended,
or expected, that the federal reserve banks would become
the universal agency for clearance of checks. For, since
against these the final clause prohibited the making of
any charge, then if the reserve banks were to become the
universal agency for clearance, there would be no oppor-
tunity for any bank to make as against any bank a charge
for the "payment of checks." The purpose of Congress
in amending § 13 by the Act of 1917 was to enable the
Board to offer to non-member banks the use of its facili-
ties which it was hoped would prove a sufficient induce-
ment to them to forego exchange charges; but to pre-
serve in non-member banks the right to reject such offer; [7]
and to protect the interests of member and affiliated non-
member banks (in competition with the non-affiliated
state banks) by allowing also those connected with the
federal system to make a reasonable exchange charge to
others than the reserve banks. The power of the Federal
Reserve Board to establish par clearance was, thus, lim-
ited by the unrestricted right of unaffiliated non-member
banks to make a charge for exchange and the restricted

---

[7] The governor of the Federal Reserve Board stated in his letter to
the Senate, January 26, 1920, Sen. Doc. 184, 66th Cong., 2d sess., p. 6:
"That a relatively small number of non-member banks should not
want to become members of the clearing system, or should not want
to remit at par is, of course, their own concern, and the Federal
Reserve Board and the Federal reserve banks have not and will not
dispute their right to decline to do so."

right of members and affiliated non-members to make the charge therefor fixed as reasonable by the Federal Reserve Board. No bank could make such a charge against the federal reserve banks—because these were prohibited from paying any such charge. Member and non-member affiliated banks, because they were such, performed the service for the federal reserve banks without charge. Unaffiliated non-member banks were under no obligation to do so. Thus construed, full effect may be given to all clauses in the Hardwick Amendment as enacted. It in no way interferes with the right of a depositor in a nonaffiliated state bank to agree with his bank that the checks which he might draw should (unless otherwise indicated on their face) be payable, at the option of the drawee, in exchange in certain cases.

The North Carolina statute here in question does not obstruct the performance of any duty imposed upon the Federal Reserve Board and the federal reserve banks. Nor does it interfere with the exercise of any power conferred upon either. It is therefore consistent with the Federal Reserve Act and with the Federal Constitution.

*Reversed.*

MR. JUSTICE VAN DEVANTER and MR. JUSTICE SUTHERLAND dissent.