# United States Court of Appeals for the Federal Circuit

---

**HADDON HOUSING ASSOCIATES, LIMITED PARTNERSHIP AND HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON,**
*Plaintiffs-Cross Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2012-5046, -5060

---

Appeals from the United States Court of Federal Claims in No. 07-CV-646, Judge Charles F. Lettow.

---

Decided: March 22, 2013

---

MARK J. VALPONI, Taft Stettinius & Hollister LLP, of Cleveland, Ohio, argued for plaintiffs-cross appellants. With him on the brief was MICHAEL J. ZBIEGIEN, JR. Of counsel was JOHN B. NALBANDIAN, of Cincinnati, Ohio.

CAMERON COHICK, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were STUART F. DELERY,

Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRIAN M. SIMKIN, Assistant Director.

———————————

Before O'MALLEY, PLAGER, and REYNA, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

The United States ("the government") appeals two decisions of the United States Court of Federal Claims ("Claims Court"). The first is an order denying the government's motion to dismiss a portion of Appellees' breach of contract action on statute of limitations grounds. *Pennsauken Senior Towers Urban Renewal Assoc. v. United States*, 83 Fed. Cl. 623, 624 (2008). The second issued following a three-day trial, finding the United States liable for breaching its contract with Appellees during 2001, and each of the years 2003-2006. *Haddon Hous. Assoc. v. United States*, 99 Fed. Cl. 311 (2011).

Rohrer Towers II Apartments ("Rohrer Towers II") is a housing facility for low-income elderly residents in Haddon Township, Camden County, New Jersey. Haddon Housing Associates, Limited Partnership leased Rohrer Towers II to Housing Authority of the Township of Haddon (collectively "Haddon"), which, in turn, entered into a housing assistance payments contract ("HAP Contract") with the United States Department of Housing and Urban Development ("HUD") to provide low-income housing under the Housing Act of 1937 ("Housing Act"). *See* Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 662–66 (1974). Haddon filed suit on September 4, 2007 alleging that HUD breached the HAP Contract in each of the years from 2001-2006 by, among other things, requiring rent "comparability studies" to be submitted along with requests for annual rent adjustments and adopting a one-percent reduction of the annual adjustment factors for units occupied by the same tenant(s) from the previous year

("non-turnover units"). The Claims Court agreed and ordered rent adjustments for all relevant years other than 2002.

The government appeals the Claims Court's ruling and contests the earlier denial of its motion to dismiss Haddon's claim for damages for the 2001 rent year on statute of limitations grounds. The government also appeals the Claims Court's decision that regulatory imposition of a mandatory one-percent (1%) rent reduction for non-turnover units was arbitrary, and thus beyond HUD's authority. Haddon appeals the Claims Court's failure to order a rent adjustment for 2002. Finally, Haddon appeals the Claims Court's refusal to set aside the government's post-contract imposition of a requirement that rent adjustment requests be submitted sixty (60) days prior to the HAP Contract anniversary date. All appeals are timely. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). For the reasons below, we affirm-in-part and reverse-in-part.

I.

Section 8 of the Housing Act created a housing assistance program through which HUD subsidizes the rents of low-income individuals and families living in privately-owned homes and apartments. *See* 42 U.S.C. § 1437f. Building owners enter into HAP Contracts that obligate HUD to pay rent subsidies on behalf of low-income occupants. *Id.* Each HAP Contract establishes the maximum monthly rent, otherwise known as the "contract rent," that a building owner is entitled to receive for a particular housing unit. 42 U.S.C. § 1437f(c)(1); 24 C.F.R. § 880.201. The tenants are obligated to pay a portion of the established monthly rent based on particular income guidelines, *see* 42 U.S.C. § 1437a, while the government pays a subsidy to the building owner to bridge the difference between the tenant obligation and contract rent. *See* 42 U.S.C. § 1437f.

The maximum monthly rent is tied to the fair market rental value of the housing. The "fair market rental" value for an area is published in the Federal Register and is based on the most recent available data of rents for existing or newly constructed rental units of various sizes and types in the market area. 42 U.S.C. § 1437f(c)(1). Once a baseline rent is established, the Housing Act also provides for at least yearly adjustments of the contract rent. 42 U.S.C. § 1437f(c)(2)(A). The upward rental adjustments are to "reflect changes in the fair market rentals established in [a] housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula." 42 U.S.C. § 1437f(c)(2)(A).

HUD uses Automatic Annual Adjustment Factors ("AAAF") to calculate the amount of the upward rental adjustments. 24 C.F.R. § 888.201. HUD publishes the AAAFs in the Federal Register at least annually. 24 C.F.R. § 888.202. Yearly increases, however, are subject to an overall limitation to ensure that "[a]djustments in the maximum rents . . . shall not result in material differences between the rents charged for assisted and comparable unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(C).

Congress twice modified the administration of HAP Contracts, in 1989 and 1994. In 1989, Congress amended the Housing Act to enforce the overall limitation by providing that the Secretary will establish regulations for conducting "comparability studies." *See* Department of Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, 103 Stat. 1987, 2057–59 (codified at 42 U.S.C. § 1437f(c)(2)(C)). A comparability study compares private market rents against Section 8 rents of units of comparable size and type in a particular area. *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 14 (1993). HUD, prompted by the amendment requirement, began to

create the studies to enforce the overall limitation in rental markets where the Secretary believed application of the AAAFs to the contract rents would generate materially higher rents for assisted units compared to similar unassisted units. *Id.* After a challenge by building owners, the Supreme Court concluded that the HAP Contracts authorized HUD to conduct such comparability studies. *Id.* at 21. Congress was not yet finished amending the statutory framework of Section 8.

In 1994, Congress revised the Housing Act and shifted the burden to building owners to prove that the adjusted rents (*i.e.*, the maximum rents plus a particular year's AAAFs) do not exceed rents of comparable unassisted units. The amendment states that, should an AAAF adjustment cause the monthly rent to exceed the fair market rent for the units, the owner must demonstrate that the adjusted rent would not exceed the rent for comparable unassisted units in the same market. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("1994 Amendments").

In response to the 1994 Amendments, HUD issued Notice 95-12. *See* HUD Directive 95-12, Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995 (Mar. 7, 1995). Notice 95-12 provides that a building owner must submit a rent comparability study at least 60 days prior to the HAP Contract anniversary date if the adjusted rent (after application of the annual AAAF) should exceed the published fair market rent for the area. *Id.* at 2–3. Absent submission of such a study, the rent would not be adjusted. But, if the owner submitted the information outside the 60-day window, the rent would be adjusted 60 days after receipt of the required information, so long as the request was made before the next contract anniversary date. *Id.* at 3. Should the owner demonstrate via a

comparability study that rents for unassisted units in the area are more than five percent over the current contract rent, HUD maintained that it would increase the rent to the lesser of: (1) the rent level adjusted by the AAAF or (2) the comparable, unassisted rent plus the initial difference (the amount by which the original contract rent exceeded the original comparable rent). *Id.* at 3–4. Should the comparability study demonstrate that the current contract rent was above the current rents for comparable unassisted units, the rent would remain steady and would not be reduced. *Id.* at 4.

Beyond the rent comparability study requirement, the 1994 Amendments amended other aspects of the administration of HAP Contracts. For non-turnover units, or units occupied by the same family at the time of the last annual rental adjustment, Congress instituted a mandatory one-percent reduction of the applicable AAAFs. *See* 42 U.S.C. § 1437f(c)(2)(A); Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, 108 Stat. at 2315. Congress also added a provision to 42 U.S.C. § 1437f(c)(2)(A) that where application of an AAAF causes the contract rent to exceed "*the fair market rental* for an existing dwelling unit in [a] market area," the owner must demonstrate that the adjusted rent would not exceed the rent for an unassisted unit. *See id.* (emphasis added). This new provision could be interpreted to supersede the overall limitation in existing HAP Contracts targeted to identify "material differences" between the rents charged for assisted units and comparable unassisted units, not whether the rent would exceed the fair market rental value. *See, e.g.*, § 2.7(d) of Haddon HAP Contract.

On January 1, 1980, Haddon Housing Associates leased Rohrer Towers II to the Housing Authority. The Housing Authority, in turn, entered into a HAP Contract with HUD for Rohrer Towers II, effective March 17, 1981. During the term of the lease, Haddon Housing Associates

agreed to operate and maintain the project and, on behalf of the Housing Authority, submit requests for rent adjustments to HUD. The HAP Contract allowed for a maximum term of 30 years and terminated on March 16, 2011. Section 2.7(b) of the HAP Contract provided that "[u]pon request from the owner to the CA [Contract Administrator], Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 CFR 888 and this Contract." Section 2.7(d) recited the "overall limitation" provision, which provided that application of a given AAAF to the contract rent "shall not" result in "material differences" between the rents charged for assisted units and comparable unassisted units in the same market.

HUD provided rent adjustments to Haddon from 1982 to 1987, but no adjustments for 1988 and 1989. From 1990 through 1995, HUD granted all of Haddon's requests for rent adjustments. HUD, however, denied Haddon's requests for rent adjustments from 1996 through 1998, for failure to include an attendant rent comparability study in compliance with recently issued Notice 95-12. Haddon did not submit requests for rent adjustments or conduct rent comparability studies from 1999 to 2001 and in 2003. In 2002, Haddon conducted a rent comparability study, but decided not to submit a request for a rent adjustment based upon its belief that the request might result in a downward adjustment of contract rents. Haddon again submitted requests for rent adjustments from 2004 through 2006, all of which HUD denied for lack of an accompanying comparability study. From 2007 through 2010, Haddon accompanied its rent adjustment requests with rent comparability studies and HUD accordingly granted the adjustments. Despite the parties' disagreement regarding rent adjustments, they continued complying with all other duties and obligations under the contract: HUD continued paying subsidies to Haddon,

while Haddon maintained and provided housing to its elderly residents.

Haddon filed suit against the government on September 4, 2007, seeking damages from September 4, 2001, forward, alleging that HUD breached the HAP Contract by not providing rent adjustments from 2001 to 2006. *See Haddon Hous. Assoc.*, 99 Fed. Cl. at 313–14. The case was initially consolidated with *Pennsauken Senior Towers Urban Renewal Assocs. v. United States*, No. 07-174C (Fed. Cl., filed March 15, 2007). *Id.* at 314, n.2. While the cases were consolidated, the government moved pursuant to Rule 12(b)(1) to dismiss Haddon's claim for damages from September 4, 2001 to March 16, 2002, contending that any claim relating to the 2001 contract year accrued on March 17, 2001, outside the six-year statute of limitations for contract claims against the government. *Pennsauken Senior Towers Urban Renewal Assoc.*, 83 Fed. Cl. at 624. The Claims Court denied the government's motion, holding that Haddon's claim for 2001 was not outside the limitations period because Haddon could have requested a 2001 rent adjustment at any time prior to March 17, 2002, and was not limited to making a request as of the beginning of the contract year. *Id.* at 628–29. The *Pennsauken* case settled, and Haddon and the United States went to trial between November 15-17, 2010. *Haddon*, 99 Fed. Cl. at 314.

The Claims Court issued its opinion and order on liability on June 24, 2011. The Claims Court held that the 1994 Amendments and HUD's implementation of the changes, namely Notice 95-12 and the comparability study requirement, constituted a breach of Haddon's HAP Contract. *Id.* at 330. The Claims Court found that HUD was liable for denying Haddon's rent adjustments from 2004 through 2006, the years during which Haddon had submitted rent adjustment requests absent a comparability study. *Id.* The Claims Court also held that Haddon

was entitled to recover the cost of the comparability study it conducted in 2007. *Id.*

The Claims Court further found that Haddon failed to submit rent adjustment requests from 2001 through 2003; a condition precedent in the HAP Contract to obtaining an adjustment. *Id.* at 330–33. The Claims Court, nevertheless, held that Haddon was excused from performance of the condition precedent under the "prevention doctrine" for the years 2001 and 2003. *Id.* The Claims Court found that the facts adduced at trial demonstrated that Haddon's failure to submit rent requests in those years was a direct result of HUD's previous denials. *Id.* As such, the Claims Court held that the government materially contributed to Haddon's failure to fulfill the condition precedent and, therefore, that Haddon was excused from performance. *Id.* Regarding 2002, the Claims Court found that the trial evidence demonstrated that the government's previous denials did not contribute to Haddon's failure to submit a rent adjustment request. *Id.* Haddon thus was not awarded any recovery for 2002. *Id.*

The trial court also held that: (1) the one-percent reduction for "non-turnover" units was not supported by adequate rationale to satisfy the Secretary's duty under 42 U.S.C. § 1437f; (2) the overall limitation in the Haddon HAP Contract does not serve as a cap on Haddon's damages because it was superseded by the 1994 Amendments[1]; and (3) the requirement that owners submit their rent requests 60 days prior to the anniversary date (or rental adjustment date if made after the anniversary date) is reasonable and within the boundaries of HUD's discretion. *Id.* at 335–42. This appeal followed.

The government argues that the trial court erred in holding that: (1) HUD breached the HAP contract by not granting rent adjustments from 2004 to 2006; (2) Haddon

---

[1] The government does not appeal this conclusion.

was excused for not submitting rent adjustment requests in 2001 and 2003; (3) the one-percent reduction for non-turnover units was improper; and (4) the statute of limitations did not bar Haddon's claim for damages for 2001.[2] Haddon cross-appeals, contending that the trial court erred in holding that Haddon was not entitled to a rent adjustment for 2002. Alternatively, Haddon argues that the Claims Court should have found the 60-day requirement established in Notice 95-12 arbitrary, thus granting Haddon's retroactive request for the 2002 adjustment.

## II.

We turn first to the Claims Court's decision in *Haddon Hous. Assoc. v. United States*, 99 Fed. Cl. 311 (2011). There, the Claims Court provided a well-reasoned and meticulous opinion detailing its factual findings and legal conclusions thereon. In significant measure, we see no reason to revisit that careful analysis. Thus, for the reasons set forth in the Claims Court's opinion, we agree that the 1994 Amendments and HUD's implementation thereof is a breach of the Haddon HAP Contract for all years at issue here. We also agree that the government's deduction of one percent (1%) from the annual adjustment factor to be applied to contract rents for non-turnover units breached the HAP Contract because the one-percent (1%) figure was arbitrary. Finally, we agree that HUD's requirement that owners request rent adjustments at least sixty (60) days prior to the contract anniversary date "fits within the boundaries of the administrative discretion HUD possesses," *Haddon Hous. Assoc.*, 99 Fed. Cl. at 341, and thus, did not breach the Haddon HAP Contract. We disagree with only the Claims Court's decision that Haddon was excused from submitting rent adjustment requests in 2001 and 2003.

---

[2] The government does not appeal the Claims Court's judgment regarding the impact of the overall limitation on Haddon's damages claims.

Haddon's HAP Contract contains a condition precedent that requires Haddon to affirmatively request a rent adjustment *each year* to trigger HUD's duty to provide an adjustment. Haddon failed to make any requests for rent adjustments from 1999 to 2003. The Claims Court excused Haddon's failure to fulfill the condition precedent in 2001 and 2003 under the so-called "prevention doctrine." The Claims Court found that the government, via the 1994 Amendments and HUD's implementation thereof, breached the Haddon HAP Contract and made clear its intention to continue to breach that contract by requiring rent comparability studies as a precondition to receipt of any rent adjustment. *Id.* at 330. The Claims Court thus concluded that Haddon's failure to fulfill the condition precedent of making a rent adjustment request in 2001 and 2003 was a direct result of the government's prior breach of its express contractual duty to grant rent adjustments upon Haddon's request, and a breach of its implied contractual duty of good faith and fair dealing. *Id.* at 332. As a result of such breach, the Claims Court found that Haddon's failure to fulfill the condition precedent was excused under the prevention doctrine. *Id.* We disagree.

## A.

We review the Claims Court's legal determinations *de novo* and its findings of fact for clear error. *Home Sav. of Am. v. United States*, 399 F.3d 1341, 1346 (Fed. Cir. 2005) (citations omitted). "A finding may be held clearly erroneous when . . . the appellate court is left with a 'definite and firm conviction that a mistake has been committed.'" *In re Mark Indus.*, 751 F.2d 1219, 1222–23 (Fed. Cir. 1984) (citations omitted).

We first turn to the Claims Court's factual findings relevant to Haddon's failure to make rent adjustment requests in 2001 and 2003. During the bench trial, Ms. Kathleen Simpkins, the Administrator of Rohrer Towers

II, testified that she submitted a letter to HUD in 1996 requesting a rent increase in accordance with that year's AAAFs. HUD denied the request because she did not include a rent comparability study along with the request, as application of the AAAFs would exceed the published fair market rental values in the area. *Id.* at 319. Ms. Simpkins again submitted rent increase requests in 1997 and 1998, and both similarly were denied because they lacked a companion comparability study. *Id.* Ms. Simpkins then chose not to submit rent increase requests from 1998 to 2003.[3] *Id.* at 319. She testified that she stopped making the requests because: "[a]fter asking for requests for three years and being denied for three years, I stopped asking. I didn't feel as though if I sent a letter every day they would – I would receive the same response." *Id.* at 332; Joint Appendix at 1046 (Trial Transcript, 234:9–13).

Beginning in 2004, and continuing through 2006, Ms. Simpkins again submitted rent adjustment requests to HUD without comparability studies. *Haddon Hous.*

---

[3] The Claims Court held that Haddon's decision to forgo requesting a rent adjustment in 2002 was based solely on its misapprehension that if the comparability study demonstrated that the current rents were more than the current fair market value rents, HUD may decrease the amount of rent subsidy it provides. *Haddon Hous. Assoc.*, 99 Fed. Cl. at 333. The Claims Court therefore found that the evidence demonstrated that the government's previous denials were not the cause of Haddon's failure to seek a rent adjustment in 2002. *Id.* Haddon now appeals that decision. Given our holding that the prevention doctrine does not apply in these circumstances, however, Haddon's contract claim for 2002 would fall under the same analysis we employ for 2001 and 2003. We, thus, do not address the precise grounds for the Claims Court's judgment regarding the 2002 contract year; we affirm it on other grounds.

*Assoc.*, 99 Fed. Cl. at 320. She restarted making the requests at the urging of Mr. Steenland, the Managing Partner of Haddon Housing Associates, because he read about a court decision which held that HUD could not require owners to generate and submit rent comparability studies. *Id.* at 320, n.19. All of the requests from 2004 to 2006 were denied for lack of a study. *Id.* In 2007, Ms. Simpkins submitted a rent increase request that included a rent comparability study. *Id.* That adjustment was granted. *Id.*

We find no error in the Claims Court's factual findings. These facts, nevertheless, do not justify application of the prevention doctrine to excuse Haddon's failure to make rent adjustment requests in 2001 and 2003. As such, we conclude that the prevention doctrine does not apply under these circumstances as a matter of law.

Generally, a party to a contract may assert the non-occurrence of a contractual condition precedent as a defense to a claim of breach. When the party asserting the defense prevented or hindered fulfillment of the condition precedent, however, it cannot rely on that failure to avoid its own obligation to perform under the contract. *See Restatement (Second) of Contracts* § 245; *Williston*, § 39:3. Such waiver is premised on the principle that a contracting party has an additional duty to refrain from conduct that prevents or hinders the occurrence of the fulfillment of the condition precedent. *Id.* If one party's prevention or hindrance of the other party's ability to fulfill a condition precedent constitutes a breach, then the party's failure to fulfill the condition precedent is excused. *Id.* Put simply, "where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party cannot in any way take advantage of that failure." *Williston*, § 39:4. The prevention doctrine has long been applied by our sister circuits with relative consistency. *See Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.*, 677

F.3d 1286, 1296 (11th Cir. 2012) ("the prevention doctrine will operate to excuse [a] condition precedent which was wrongfully prevented from occurring") (quoting *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 892 F.Supp. 89, 93 (S.D.N.Y. 1995)); *Tabatabai v. West Coast Life Ins. Co.*, 664 F.3d 663, 667 (7th Cir. 2011) (stating that if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused); *Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) ("a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent."); *Ne. Drilling, Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) ("[u]nder the so-called prevention doctrine, a contractual condition precedent is deemed excused when a promisor hinders or precludes fulfillment of a condition and that hindrance or preclusion contributes materially to the nonoccurrence of the condition."); *Mendoza v. COMSAT Corp.*, 201 F.3d 626, 630 (5th Cir. 2000) (same); *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000) ("[t]he prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused."); *Apalucci v. Agora Syndicate*, 145 F.3d 630, 634 (3d Cir. 1998) ("when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."). We do not take issue with the Claims Court's recognition of the doctrine in the abstract.

We find, however, that HUD's insistence on comparability studies, though a breach of the HAP contract, does not operate to excuse Haddon's failure to make the requests for adjustments required under § 2.7(b) of the HAP Contract. HUD's implementation of the 1994 Amendments and subsequent denials of rent adjustments in 2001 and 2003 did not "prevent" or "hinder" Haddon from

making future requests and, thus, cannot justify application of the prevention doctrine.

Haddon has made no showing that HUD took any action that prevented or hindered its ability to make a request for a rent adjustment in 2001 and 2003. While the previous denials may have served to discourage Haddon from making future requests, HUD nevertheless did not impede Haddon from doing so. HUD received Haddon's previous requests from 1996 to 1998, determined that application of the AAAFs to the current contract rents would violate the overall limitation in § 2.7 of the HAP Contract and, because Haddon had not submitted a comparability study as required under those circumstances, denied the requests. HUD took no other action that conceivably could be interpreted as preventing Haddon from making requests in 2001 and 2003. HUD, for example, did not refuse to process Haddon's requests, nor did HUD threaten to penalize Haddon for making the requests without comparability studies. HUD's requirement that Haddon submit a comparability study improperly imposed an additional obligation on Haddon, but HUD did nothing to prevent Haddon from submitting a request without a rent comparability study in compliance with its original obligations under the HAP Contract.

The trial testimony unequivocally demonstrated that Ms. Simpkins stopped submitting requests for rent adjustments after the previous denials because she was frustrated by HUD's insistence on comparability studies, and for no other reason. Mere discouragement is not enough to demonstrate that HUD "prevented" Haddon from submitting the requests. Indeed, Haddon's ability to restart submitting rent adjustment requests in 2004 (without rent comparability studies) belies Haddon's contention that HUD prevented or hindered Haddon from submitting the previous years' requests. Nothing changed from 2003 to 2004 other than Haddon's subjective belief that HUD lacked the legal authority to require rent

comparability studies with rent adjustment requests. Absent a showing that HUD took some action that prevented or hindered Haddon's ability to submit its requests, the prevention doctrine does not apply to excuse Haddon's failure to submit rent requests in 2001 and 2003.

## B.

Haddon also argues that HUD undoubtedly would have denied the requests in 2001 and 2003, making it futile to have submitted them. Because it found that the prevention doctrine applied, the Claims Court did not address Haddon's futility argument. *Haddon*, 99 Fed. Cl. at 335 n.37. We find, however, that the prevention doctrine does not apply under the circumstances presented; therefore, we turn to Haddon's alternative argument. Because Haddon did not bring a claim for anticipatory repudiation, Haddon's futility argument does not absolve it from satisfying its own contractual obligations—including its duty to actually make requests for rent adjustments before they are granted.

For "an aggrieved party to recover damages for an anticipatory repudiation, it must elect to treat the repudiation as a total breach." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005). A claim of anticipatory repudiation requires the aggrieved party to terminate the contract and file suit. *See Williston* § 39:32. Haddon did not pursue a claim for anticipatory repudiation, but instead filed a claim for partial breach. *Haddon*, 99 Fed. Cl. at 333–35. Both parties, moreover, continued to perform their duties and obligations as required by the HAP Contract. *Id.*

Had Haddon pursued a claim for anticipatory repudiation, the posture of this suit would be different. Haddon would have treated HUD's adoption of Notice 95-12 as a *total breach*, terminated the contract, and filed suit. *See Williston* § 39:32. Under those circumstances, the gov-

ernment would have been relieved of any continuing duty to perform according to the contract. *Id.* But, as the Claims Court recognized, Haddon elected to pursue a claim for partial breach and the government continued performing, Haddon therefore cannot then refuse to perform its obligations under the contract. *Haddon*, 99 Fed. Cl. at 334 n.35 (citing *Williston* § 39:32).

As such, Haddon cannot now argue, in the context of a partial breach claim, that it should be absolved of performing its obligations under the HAP contract. Crediting such an argument would allow Haddon an end run around the consequence of electing not to bring an anticipatory breach claim. In other words, Haddon would gain the benefit of the government's continued performance and also be absolved of performing its own end of the bargain. Haddon cannot have it both ways. Haddon elected to pursue a claim for partial breach and continued to receive the benefits of the government's performance, *i.e.* rent subsidies; it cannot now claim that the government was required to perform despite Haddon's failure to make a simple request for a rent adjustment in 2001 and 2003—even if such a request would have been futile. Without the prevention doctrine relieving Haddon of its responsibilities, Haddon's futility argument is without merit.

## III.

We now turn to the Claims Court's decision in *Pennsauken Senior Towers Urban Renewal Assocs., LLC v. United States*, 83 Fed. Cl. 623 (2008), regarding the applicability of the six-year statute of limitations to Haddon's claim for damages from 2001. The Claims Court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a), is limited to claims filed within six years after a claim first accrues. 28 U.S.C. § 2501. This six-year statute of limitations is not an affirmative defense, but

affects the Claims Court's jurisdiction.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132–33 (2008).

Haddon filed its suit on September 4, 2007, effectively conferring the Claims Court's jurisdiction over claims that accrued on or after September 4, 2001.  As the Claims Court recognized, because "the portion of Haddon's claim extending from September 4, 2001, through the following six months [fell] within the 2001 anniversary year of the [Haddon HAP Contract], which began on March 17, 2001," the issue is whether Haddon's claim for adjustments during the 2001 anniversary year is barred because it relates back to an anniversary date that falls outside the statute of limitations.  *Pennsauken Senior Towers Urban Renewal Assocs., LLC*, 83 Fed. Cl. at 627.

The Claims Court first found that there was an "intractable ambiguity" on the face of the Haddon HAP Contract and 24 C.F.R. § 888.203, which is incorporated into § 2.7(b) of the Haddon HAP Contract.[4]  *Id.* at 627.  Section 2.7(b)(1) provides that contract rents will be adjusted on the anniversary date of the contract, or here, March 17, 2001.  Section 888.203 of the Code of Federal Regulations, however, refers to the "adjusted *monthly* amount," which might be interpreted to allow for monthly rent adjustments.  *See* 24 C.F.R. 888.203(b) (emphasis added).  As such, the Claims Court turned to HUD's interpretation of its own regulation to resolve the ambiguity.  *Pennsauken Senior Towers Urban Renewal Assocs., LLC*, 83 Fed. Cl. at 628.

The Claims Court consulted HUD's Notice 95-12 for the proper interpretation.  *Id.* at 628–29.  Notice 95-12

---

[4]    As previously discussed, § 2.7(b)(2) of the Haddon HAP Contract states: "[u]pon request from the Owner to the [Contract Administrator], Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 CFR 888 and this Contract."

specifies that a building owner must submit its request for a rent adjustment sixty (60) days before the contract anniversary date to receive a rent adjustment on the anniversary date. *Id.* at 626. HUD's notice, however, also provides that, should an owner submit a rent adjustment request after the anniversary date, the adjusted rent will go into effect 60 days after receipt of the information, so long as it is submitted prior to the next anniversary date. *Id.* The Claims Court thus concluded that HUD's own interpretation of the regulation contemplated mid-year adjustments of the contract rents. *Id.* at 629. As such, the Claims Court held Haddon could have requested a rent adjustment on or after September 4, 2001, and still received an adjustment; therefore, Haddon's claims from the latter months of 2001 were not barred by the six-year statute of limitations. *Id.*

The Claims Court provided a succinct analysis of the jurisdictional issue and whether the statute of limitations barred Haddon's claims. We decline to reach the merits of the issue, however. It is undisputed that Haddon did not make a request for a rent adjustment in 2001, with or without a rent comparability study. Because we find that the prevention doctrine does not excuse Haddon's failure to make a request in 2001, the question of whether the statute of limitations bars any claims from September 4, 2001 to March 17, 2002, the contract anniversary date, is moot.

## IV.

For the foregoing reasons, we reverse the Claims Court's finding that the prevention doctrine applied to the circumstances surrounding Haddon's 2001 and 2003 rent adjustment. We affirm the Claims Court's judgment with respect to the contract years 2002 and 2004-2006.

**AFFIRMED IN PART, REVERSED IN PART**