EVERGREEN SQUARE OF CUDAHY,
et al., Plaintiffs–Appellants,

v.

WISCONSIN HOUSING & ECONOMIC
DEVELOPMENT AUTHORITY, Defen-
dant/Third Party Plaintiff–Appellee.

and

Craig T. Clemmensen, Acting Secretary
of the United States Department of
Housing & Urban Development, Third
Party Defendant–Appellee.

No. 16-1475

United States Court of Appeals,
Seventh Circuit.

Argued September 27, 2016

Decided February 17, 2017

Carl Coan, III, Attorney, Coan & Lyons, Washington, DC, K. Scott Wagner, Attorney, Wagner Law Group, S.C., Milwaukee, WI, for Plaintiffs–Appellants.

Robert A. Jaffe, Barry Paul Steinberg, Attorneys, Kutak Rock LLP, Washington, DC, for Wisconsin Housing and Economic Development Authority.

David DeCelles, Attorney, Department of Justice, Washington, DC, for Craig T. Clemmensen.

Before BAUER, ROVNER, and HAMILTON, Circuit Judges.

ROVNER, Circuit Judge.

Evergreen Square of Cudahy ("Evergreen Square"), Grant Park Square Apartments Company ("Grant Park"), and Washington Square Apartments Company ("Washington Square") are property owners (collectively, "Owners") who participated in the federal rental assistance program commonly known as "Section 8." They sued the Wisconsin Housing and Economic Development Authority ("Wisconsin Housing" or the "Authority") for allegedly breaching the contracts that governed payments to the Owners under the program. Because Wisconsin Housing receives all of its Section 8 funding from the United States Department of Housing and Urban Development ("HUD"), the Authority filed a third-party breach of contract claim against HUD. The district court granted summary judgment in favor of Wisconsin Housing and dismissed the claims against HUD as moot. The Owners appeal and we affirm.

I.

The Section 8 program provides housing assistance payments "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing[.]" 42 U.S.C. § 1437f(a). *See also Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12–14, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (explaining basic features of the Section 8 program). The program is administered by HUD in conjunction with public housing agencies. HUD enters into annual contribution contracts with public housing agencies, which in turn enter into contracts with property owners to make housing assistance payments that subsidize rentals for qualified tenants. Under these contracts, the tenants are required to pay a percentage of their income to the property owners, the housing agencies pay the remaining rent, and HUD reimburses the housing agencies. In areas where there are no public housing agencies, HUD enters into contracts directly with property owners in order to provide housing assistance payments. In this case, HUD contracted with Wisconsin Housing, which in turn entered into agreements with each of the Owners. The parties call the agreements between the state housing agencies and property owners "housing assistance payment contracts" or "HAP contracts" and we will follow that convention as well.

Section 8 provides that the HAP contracts will establish the maximum monthly rent which property owners are entitled to receive for each dwelling unit. 42 U.S.C. § 1437f(c)(1)(A). In addition to setting standards for the initial rent for subsidized units, Section 8 also dictates how rents may be adjusted in order to reflect changes in fair market rental values over time. The statute provides that a HAP contract "shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula." 42 U.S.C. § 1437f(c)(2)(A). But Congress also imposed an overall limit on any increases, providing that rent adjustments "shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(C).

Even with these measures in place, the automatic rent increase system sometimes pushed rents well above market rates for comparable unsubsidized housing units. *See One & Ken Valley Housing Group v. Maine State Housing Auth.*, 716 F.3d 218, 221 (1st Cir. 2013). When HUD tried to rein in the excess increases, lawsuits followed. In response to this litigation over HAP contracts, Congress amended Section 8, first in 1988 and again in 1994. As a result of the 1988 amendments, HUD or a public housing agency could deny an automatic annual rent adjustment at a Section 8 site by submitting a comparability study to the property owner at least sixty days before the adjustment was to take effect. *One & Ken Valley*, 716 F.3d at 221–22. This change led to more litigation by property owners who asserted that their HAP contracts entitled them to automatic annual adjustments without regard to comparability studies. The Supreme Court concluded that, under the overall limitations clause of the HAP contracts, property owners were not entitled to formula-based rent adjustments that materially exceed market rents for comparable units. *Alpine Ridge*, 508 U.S. at 21, 113 S.Ct. 1898. The Court also found that the overall limitation clause of the HAP contracts "affords the Secretary sufficient discretion to design and implement comparability studies as a reasonable means of effectuating its mandate." *Alpine Ridge*, 508 U.S. at 21, 113 S.Ct. 1898; *One & Ken Valley*, 716 F.3d at 222.

In 1994, one year after the *Alpine Ridge* decision, Congress amended Section 8 again:

[W]here the maximum monthly rent ... to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A). Under the 1988 provision, HUD had the burden of producing a comparability study whenever it sought to withhold an automatic adjustment. The 1994 amendment shifted to the property owners the burden of demonstrating that adjusted rents would not exceed the market rent for comparable unassisted units. *One & Ken Valley*, 716 F.3d at 222.

In 1995, HUD issued Notice H 95–12 ("1995 Notice") in order to provide housing authorities with guidelines for implementing the statutory changes. The 1995 Notice directed public housing authorities to consult HUD's annual fair market rent charts for different unit types[1] in different geographic regions. Where the automatic increase would result in a rent higher than the corresponding fair market value listed in HUD-published tables, the 1995 Notice directed public housing authorities to assume that the contract rent is above-market. But HUD also accounted for the fact that, under the overall limitation clause, landlords were entitled to receive above-market rents to the extent that those differences existed at the outset of their contracts:

HUD adopted an assumption that, from the outset, public housing agencies were paying Section 8 landlords 10 percent more than the fair market rents for comparable units.

As long as the difference between the adjusted rent and the fair market rent is

---

1. "Unit type" refers to the size of the housing unit. Unit types include efficiency, one-bedroom, two-bedroom, three-bedroom and four-bedroom units.

less than this "initial difference," Notice H 95–12 allows state and local housing agencies to continue to grant rent increases based on the automatic annual adjustment factors. However, if the difference between the adjusted rent and the HUD-published fair market rate rises to more than 10 percent of the initial contract rent, Notice H 95–12 instructs housing authorities to deny further upward adjustments to Section 8 landlords. A Section 8 landlord can only escape from under this ceiling by submitting its own rent comparability study showing that, despite the discrepancy with HUD's published fair market rents, the Section 8 unit is actually under-priced relative to comparable unsubsidized units in the area.

*One & Ken Valley*, 716 F.3d at 223.[2]

As part of the Section 8 program, each year, HUD publishes "annual adjustment factors" for specific geographic areas that reflect changes in the Consumer Price Index for rents and utilities over the prior year. *See* 24 C.F.R. §§ 888.201–204 (2012). Prior to the 1994 amendments, HUD published a single table to apply to all housing stock. After the 1994 amendments, HUD began publishing two tables each year, one for "turnover units," and one for "non-turnover units." The turnover rates apply to units occupied by a new tenant since the last annual contract anniversary date. The non-turnover rates apply to units occupied by the same tenant as the last contract anniversary date. The tables presume that the costs to landlords are lower when the same tenant stays in the unit, and so the non-turnover rates are one percent (.01) lower than the turnover rates.

To this point, we have described the general provisions at play in all Section 8

HAP contracts, and we now turn to the facts specific to this case. Evergreen Square owns a 105–unit housing project in Cudahy, Wisconsin. Evergreen Square's HAP contract term began with a five-year term on April 1, 1977. The contract has been renewed seven times (in five year increments) and is set to expire on March 31, 2017. Grant Park owns a 153–unit project in South Milwaukee, Wisconsin. Grant Park's initial five-year contract commenced on July 1, 1980 and was then renewed for five additional five-year terms, expiring on June 30, 2010. Washington Square owns an 88–unit project in Cudahy, Wisconsin. Washington Square's initial twenty-year HAP contract went into effect on December 1, 1982, was renewed twice for five-year terms, and expired on November 30, 2012. Both the Evergreen Square and Grant Park HAP contracts provide that, on the anniversary date, the contract rents "shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." Washington Square's contract is slightly different. It provides that, "[u]pon request from the Owner to [Wisconsin Housing], Contract Rents will be adjusted on the anniversary date" of the HAP Contract "in accordance with 24 CFR Part 888 and this Contract. See, however, paragraph (d)." Paragraph (d) implemented the overall limitation provision of the statute. A similar overall limitation paragraph appears in the contracts for Evergreen Square and Grant Park, but only Washington Square was required to ask for the automatic annual increase. From 2006 until the contract expired in 2012, Wisconsin Housing approved adjustments to Washington Square's rents only

---

**2.** Since 1995, successive HUD publications have carried forward the implementation of these policies. As of the time the district court ruled, Notice H 2002–10 ("2002 Notice") was the most recent of the notices.

when Washington Square submitted a rent adjustment request.

The Owners sued Wisconsin Housing in federal court for breaching the HAP contracts by failing to approve automatic rent increases for certain years, by requiring the Owners to submit comparability studies in order to receive increases, and by arbitrarily reducing the increases for non-turnover units by one percent. Wisconsin Housing filed a third-party suit against HUD, which provides all of the funding for the program. After the district court dismissed the suit for lack of federal jurisdiction, we reversed and remanded with instructions to reinstate the plaintiffs' complaint. *See Evergreen Square of Cudahy v. Wisconsin Housing & Econ. Dev. Auth.*, 776 F.3d 463 (7th Cir. 2015). We concluded that, although the breach of contract claims found their origins in state rather than federal law, the claims belonged in federal court under the "special and small category of cases in which arising under jurisdiction still lies." *Evergreen Square*, 776 F.3d at 465–66 (quoting *Gunn v. Minton*, — U.S. —, 133 S.Ct. 1059, 1064, 185 L.Ed.2d 72 (2013)).

On remand, the plaintiffs proceeded with three primary claims against Wisconsin Housing: (1) breach of Washington Square's HAP contract for failing to automatically adjust contract rents on an annual basis; (2) breach of all the Owners' HAP contracts for employing a one percent reduction on the rent adjustments for non-turnover units; and (3) declaratory judgment to determine whether Wisconsin Housing could require, under Evergreen Square's HAP contract, rent comparability studies as a prerequisite to receiving rent adjustments or employ a one percent reduction for rent adjustments on non-turnover units. For the third-party claims against HUD, the court allowed Wisconsin Housing to proceed on claims for breach of

the annual contributions contracts and declaratory judgment to determine Wisconsin Housing's rights and obligations under the 1994 amendments. After all parties moved for summary judgment, the district court granted judgment in favor of Wisconsin Housing on all of the Owners' claims, and dismissed the third party claims against HUD as moot. The Owners appeal.

## II.

On appeal, the Owners contend that Washington Square should not be held to the contract provision requiring it to request an annual adjustment before receiving one. They contend that Washington Square should be excused from complying with this contract term because: (1) enforcing the provision would result in a disproportionate forfeiture; and (2) Wisconsin Housing breached the Washington Square HAP contract by requiring a rent comparability study as a prerequisite to receiving an increase. The Owners also argue that the district court erred in upholding the one percent reduction for rent increases in non-turnover units, maintaining that the adjustments must be made on a reasonable basis and the one percent reduction is arbitrary. Our review of the district court's grant of summary judgment is *de novo*. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Yahnke*, 823 F.3d at 1070.

### A.

The district court noted that "[t]he parties do not dispute the application of Wis-

consin law to the parties' state-law breach of contract claim." *Evergreen Square of Cudahy v. Wisconsin Housing & Econ. Dev. Auth.*, 2016 WL 53871, *8 n.19 (E.D. Wis. Jan. 4, 2016). The court cited *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 320, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005), for the proposition that the Supreme Court expressly contemplated the application of state law in these circumstances.[3] In their opening brief, the Owners assumed (without arguing) that Wisconsin law would apply to the contract-based claims. Wisconsin Housing also assumed in its response brief that Wisconsin law would apply to any state-law breach-of-contract claim, citing our earlier opinion regarding jurisdiction. *See Evergreen Square*, 776 F.3d at 465 (where we referred to the plaintiffs' claims as "state-law breach-of-contract claims").[4]

But HUD took another view. In its response brief, HUD asserts that the enforcement of Section 8 HAP contracts is a question of nationwide applicability that must be governed by federal common law. In a footnote, HUD cited *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), and *Price v. Pierce*, 823 F.2d 1114, 1120 (7th Cir. 1987), in support. *Kimbell Foods* noted that "federal law governs questions involving the rights of the United States arising under nationwide federal programs." 440 U.S. at 726, 99 S.Ct. 1448. However:

> Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules. Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.

*Kimbell Foods*, 440 U.S. at 727–28, 99 S.Ct. 1448 (omitting internal citations and quotation marks). In determining whether state or federal law should apply in such circumstances, the Court considered whether the federal program at issue should be, by its nature, uniform in character throughout the nation; whether the application of state law would frustrate specific objectives of the federal program; and whether the application of a federal rule would disrupt commercial relationships predicated on state law. *Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. 1448.

In *Price*, we considered a suit brought by prospective tenants of Section 8 housing against a property owner that had a contract with the Illinois Housing Development Authority. The would-be tenants were turned away by the property owner, allegedly in violation of a contract between the owner and the housing authority to reserve a percentage of units for low-income tenants in exchange for mortgage

---

**3.** Specifically, the district court cited Justice Thomas's concurrence, where he stated, "[t]he Court faithfully applies our precedents interpreting 28 U.S.C. § 1331 to authorize federal-court jurisdiction over some cases in which state law creates the cause of action but requires determination of an issue of federal law[.]" *Grable & Sons*, 545 U.S. at 320, 125 S.Ct. 2363 (Thomas, J., concurring). The court may have over read the import of the concurrence, which does not seem to "expressly" contemplate application of state law

in these circumstances. The decision focuses on whether federal jurisdiction exists in a case requiring the court to interpret a federal tax provision in the context of a state court suit to quiet title. The Court did not directly answer the question presented here.

**4.** Although we characterized the plaintiffs' complaint as presenting "state-law breach-of-contract claims," we did not address whether Wisconsin law should be applied.

subsidies the owner received. The question was "what remedies shall be available for breach of a contract designed to effectuate the program of economically mixed housing." *Price*, 823 F.2d at 1120. We decided ultimately that federal law should apply:

The argument for a federal rule is particularly strong in these housing cases; as we suggested earlier, it would be odd to think that a suit by tenants and applicants for federally subsidized housing against developers of such housing for breach of contracts approved by HUD and fundamental to the achievement of HUD's objectives under section 1437f would have to be brought in state court and decided in accordance with state contract law.

*Price*, 823 F.2d at 1120. *See also Holbrook v. Pitt*, 643 F.2d 1261, 1270 n.16 (7th Cir. 1981) (concluding in a suit interpreting HUD contracts that "[f]ederal common law applies to plaintiffs' third-party beneficiary claims since a federal agency is a party to the action and since the outcome of this case will directly affect substantial financial obligations of the United States.").

Although HUD clearly relied on *Kimbell Foods* and *Price*, two arguably controlling cases, in their reply, the Owners chastise HUD for "[c]iting no authority for its position." Reply Brief at 3 n.2. In this undeveloped, footnoted argument, the Owners turn to *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), in support of a bald claim that federal common law is applied only in exceptional circumstances and that this case is not one of them. In fact, in *Texas Industries*, the Court opined that:

federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights

of States or our relations with foreign nations, and admiralty cases. In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.

451 U.S. at 641, 101 S.Ct. 2061. Given that the United States would be obligated to reimburse the state housing authority for rent increases, and given that a federal statute controls much of the language of HAP contracts, this passage arguably supports the application of federal common law. As we noted in *Price*, it would be peculiar to construe contracts that are approved by HUD, and that are fundamental to the success of HUD's objectives under Section 8, in accordance with state contract law. Application of state law to the standardized language of the HAP contracts and resort to state law defenses to breaches of HUD contracts could lead to a lack of uniformity in this nation-wide program that is largely dependent on federal funding.

So after the district court thought the choice-of-law matter resolved, we are left on appeal with a war waged in footnotes on a complex issue. A party may waive an argument by presenting it only in an undeveloped footnote. *United States v. Warner*, 792 F.3d 847, 856 (7th Cir. 2015); *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013). Moreover, none of the parties briefed the question of whether there is a difference between federal common law and Wisconsin law that would affect the outcome here. As we conclude below, however, the choice of law applicable to the breach of contract claims does not affect the outcome here. *See also Eriem Surgical, Inc. v. United States*, 843 F.3d

1160, 1161 (7th Cir. 2016) (noting that one might infer from *Kimbell Foods* that, in determining which law governs corporate successorship when the dispute concerns debts to the national government, federal law controls but generally absorbs state law unless it is hostile to national interests, but also noting that the Supreme Court has reserved the issue).

## B.

We begin with Washington Square's claim that it should not be held to the language in its HAP contract providing that rents would be adjusted annually "upon request from the Owner." From 2006 to 2012, Wisconsin Housing adjusted Washington Square's rents only when Washington Square submitted a rent adjustment request to the Authority. Washington Square contends that it should be excused from the requirement of requesting the annual adjustment because holding it to this term would result in a "disproportionate forfeiture." Washington Square cites Restatement (Second) of Contracts § 229 (Excuse of a Condition to Avoid Forfeiture) in support of this argument:

> To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

Washington Square asserts that if the court holds it to the contract term requiring it to ask for a rent adjustment before receiving one, it will lose some $400,000 in revenue, a result it characterizes as a "disproportionate forfeiture." Washington Square argues that adherence to this term of the contract may be excused because it is not a material term of the agreement and it provides no pecuniary benefit to Wisconsin Housing.

In making this argument, the Owners (who insist that Wisconsin law applies) concede that the "doctrine of disproportionate forfeiture is not well-developed in Wisconsin." That is an understatement: none of the parties were able to find a case where a Wisconsin court relied on section 229 to decide an issue. Nor is there any indication in the case law that this section of the Restatement has been adopted into the federal common law of contracts. In any case, as the district court explained, section 229 of the Restatement does not apply here, and cannot be used to excuse Washington Square's failure to perform under the HAP contract.

First, application of section 229 is discretionary and so Washington Square would have to demonstrate on appeal that the court abused its discretion in refusing to apply the doctrine. *See* Restatement (Second) of Contracts § 229, cmt. b (noting that the rule is a flexible one and stating that "its application is within the sound discretion of the court."). The district court declined to apply section 229 here because the court concluded that the HAP contract's "request" provision was a material term. The court noted that the language of the contract requiring Washington Square to request an adjustment was an unambiguous condition precedent, and Washington Square failed to fulfill this requirement in the pertinent years. *See Haddon Housing Assocs., L.P. v. United States*, 711 F.3d 1330, 1336–40 (Fed. Cir. 2013) (treating the HAP contract provision requiring an owner to request an increase before receiving one as a clear and enforceable condition precedent). In fact, the Owners conceded that Wisconsin Housing did not deny any of Washington Square's requests for a rent adjustment, and the only years in which Washington Square did not receive an adjustment were those in which it did not submit a request. As the district

court noted, rent requests set into motion a time and labor intensive process, and so this was not a mere technical term. *See* 2002 Notice (describing the process for adjustment of contract rents).[5] In short, the parties treated the requirement as a material term, it was a material term, and section 229 of the Restatement cannot, therefore, be applied to excuse it. There was no abuse of discretion in that decision.

■ Section 229 also does not apply because there is no forfeiture in play here. " '[F]orfeiture' is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange." Restatement (Second) of Contracts, § 229, cmt. b. Washington Square does not point to any evidence that it took any action in substantial reliance on the expectation of rent increases. As is apparent from the consistent practice of the parties, Washington Square knew it would not receive an increase unless, as required by the HAP contract, it requested one. Reliance on an unrequested increase would not have been reasonable under the circumstances.

Washington Square also asserts that it was excused from the condition precedent of requesting an increase because Wisconsin Housing breached the contract by requiring rent comparability studies prior to receiving an increase. Relying on the Federal Circuit's opinion in *Haddon*, Washington Square asserts that Wisconsin Housing's implementation of the 1994 amendments is a breach of the HAP contract. But the HAP contract in *Haddon* was executed in 1981 with a thirty-year term. 711 F.3d at 1334.[6] The 1994 amendments came in the midst of that term and the implementation of those amendments in the middle of the term arguably breached the HAP contract as it was originally written. Washington Square fails to acknowledge that its original HAP contract expired in 2002, and that the 1994 amendments became a part of the HAP contract when it was renewed that year. *See Norfolk & Western*, 499 U.S. at 130, 111 S.Ct. 1156 (noting that laws in existence at the time and place of the making of a contract are incorporated into the terms of the contract); *Dairyland Greyhound Park*, 719 N.W.2d at 432 (same). *Haddon* is thus distinguishable on the

---

**5.** Washington Square asserts that the procedures set forth in the 2002 Notice could not fairly apply to a contract executed in 1982. But Washington Square fails to note that the original term of the contract was twenty years, expiring in 2002. The agreement was then renewed twice for two additional five year terms, until its expiration in 2012. Washington Square is suing for rent increases during the extended term, when the 2002 Notice was in effect. Moreover, Washington Square's claims for damages are cabined by the statute of limitations. The date of the earliest breach for which Washington Square may recover is December 1, 2007, which is well after the 2002 contract renewal. *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a

part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge."); *Farmers' & Merchants' Bank of Monroe, N.C. v. Federal Reserve Bank of Richmond, Va.*, 262 U.S. 649, 660, 43 S.Ct. 651, 67 L.Ed. 1157 (1923) (same); *Dairyland Greyhound Park, Inc. v. Doyle*, 295 Wis.2d 1, 719 N.W.2d 408, 432 (2006).

**6.** In *Haddon*, the Federal Circuit characterized the length of the HAP contract as "for a maximum term of 30 years." *See also Haddon Housing Assocs., LLC v. United States*, 99 Fed. Cl. 311, 316 (2011) (noting that Haddon leased its property to the housing authority for a thirty-year term).

facts because the 1994 amendments were applied in that case to a contract that predated the passage of the law.[7]

■ But assuming for the sake of argument that the implementation of the 1994 amendments was a breach of Washington Square's HAP contract, even *Haddon* does not support Washington Square's contention that the breach excused it from complying with the condition precedent. *Haddon*, 711 F.3d at 1338 ("We find, however, that HUD's insistence on comparability studies, though a breach of the HAP contract, does not operate to excuse Haddon's failure to make the requests for adjustments required under § 2.7(b) of the HAP Contract."). The *Haddon* court rejected any claim that performance of the condition precedent was excused by HUD's alleged breach because the property owner failed to demonstrate that HUD took any action that prevented or hindered the owner's ability to make a request for a rent adjustment. The same rationale applies here. Wisconsin Housing did nothing to prevent Washington Square from making the request for an increase. As in *Haddon*, there was no allegation that Wisconsin Housing refused to process requests or threatened to penalize Washington Square for making requests unsupported by a rent comparability study. To the contrary, in years where Washington Square made the request for an adjustment, Wisconsin Housing granted those requests without requiring a rent comparability study.

■ Finally, the district court found it unnecessary to decide Washington Square's argument that the Authority repudiated the HAP contract by requiring rent comparability studies. The court concluded that the argument was unsupported by the record because Washington Square had conceded that it did not submit any rent comparability studies to Wisconsin Housing during the limitations period, and yet received certain rent adjustments nonetheless. Washington Square's argument was thus reduced to a claim that, if it had submitted a request for a rent increase, it may have been denied the increase absent a rent comparability study, if gross rents exceeded fair market value. The district court, noting the many uncertainties and gaps in the record, characterized this as a skeletal argument that need not be decided. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (finding that an undeveloped claim is not preserved). We agree. But for the sake of completeness, we also note that, having elected to continue with the contract in the face of Wisconsin Housing's alleged breach, Washington Square was still bound by the terms of the deal, including the condition precedent. *Haddon*, 711 F.3d at 1339 (where the owner elected to pursue a claim for partial breach and the government continued performing, the owner cannot then refuse to perform its obligations under the contract). If a party to a contract breaks it, the other party can abandon the contract (unless the breach is very minor) and sue for damages, or it can continue with the contract and sue for damages. But if it makes the latter election, it is bound to the obligations that the contract imposes on it. *Emerald Invs. Ltd.*

---

**7.** The Federal Circuit concluded that HUD's implementation of the 1994 amendments constituted a breach of the Haddon HAP contract. 711 F.3d at 1336. *Haddon* is distinguishable from the instant case because the changes effected by the 1994 amendments came in the middle of the contract term, and because Haddon sued HUD directly rather than the local housing authority. We do not decide today whether the 1994 amendments would breach a HAP contract if the changes were implemented in the middle of a contract term or if an owner sued HUD directly. That is simply not the situation here, and so our decision is not in conflict with that of the Federal Circuit.

P'ship v. Allmerica Fin. Life Ins. & Annuity Co., 516 F.3d 612, 618 (7th Cir. 2008). Because Washington Square continued with the contract in the face of Wisconsin Housing's alleged breach, Washington Square was bound by the obligations of the contract, including the requirement that it request an adjustment of rent.

### C.

■ Finally, all of the Owners challenge the district court's determination that Wisconsin Housing did not breach any HAP contracts by applying a one percent reduction for non-turnover units when calculating rent adjustments. The Evergreen Square and Grant Park HAP contracts provide that contract rents "shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." The Washington Square HAP contract specifies that rents will be adjusted "in accordance with 24 C.F.R. Part 888 and this Contract." Prior to 1995, HUD published one table each year in the Federal Register, listing adjustment factors used to determine rent increases. The same rate was applied to turnover and non-turnover units. But with the 1994 amendments, Congress implemented a mandatory one percent reduction in the annual adjustment factor for non-turnover units:

> for any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

42 U.S.C. § 1437f(c)(2)(A). At the time each Owners' HAP contract was initially executed, the statute provided only that the adjustments reflect fair market rents in the housing area for similar types and sizes of dwelling units, or that the new rents be calculated on the basis of a reasonable formula. The Owners assert that the later-implemented one percent reduction for non-turnover units is not based on fair market rents and is not calculated on the basis of a reasonable formula. Rather, they characterize the reduction as arbitrary and in breach of the HAP contracts.

■ As with the other arguments regarding breach of contract, the Owners do not take into account that, although a different version of the statute was in place at the time the HAP contracts were originally executed, all of the original contracts expired and were renewed before the time period for which they are now claiming damages. In particular, Evergreen Square entered into its first HAP contract on April 1, 1977 for a term of five years. The contract was then renewed for seven additional five-year terms, with an expiration date of March 31, 2017. Grant Park's initial HAP contract became effective July 1, 1980, with an initial contract term of five years. It was subsequently renewed for five additional five-year terms. And Washington Square's HAP initial contract became effective December 1, 1982, with a term of twenty years. It was then renewed for two additional five year terms. The Owners filed suit in June 2013, and the statute of limitations is six years. The 1994 amendments went into effect in 1995, and therefore each owner renewed its HAP contract after the 1994 amendments and before the first date for damages under the statute of limitations. Because laws which exist at the time of the making of a contract enter into and form a part of it as fully as if they had been expressly referred to or incorporated in its terms, the 1994

amendments became part of each contract that was renewed after the 1994 amendments became effective. *Norfolk & Western Ry. Co.*, 499 U.S. at 130, 111 S.Ct. 1156; *Farmers' & Merchants' Bank*, 262 U.S. at 660, 43 S.Ct. 651; *Dairyland Greyhound Park*, 719 N.W.2d at 432. This means that Wisconsin Housing did nothing more than apply the law that was in effect when the HAP contracts were renewed. Because that law was incorporated into the contracts, the Authority's implementation of the statute's one percent reduction for non-turnover units could not breach any of the contracts.

The district court rejected the Owners' challenge to the one percent reduction for a slightly different reason. The district court found that Wisconsin Housing was required by the HAP contracts and by law to use the tables published by HUD. It was HUD, not Wisconsin Housing, that published the table reflecting the one percent reduction for non-turnover units. The HAP contracts for Evergreen Square and Grant Park stated that annual rent adjustments must be calculated "by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." The HAP contracts make clear that it is HUD's responsibility to determine the applicable adjustment factors. For Washington Square, the HAP contract provided that rents would be adjusted "in accordance with 24 C.F.R. Part 888 and this Contract." Under 24 C.F.R. Part 888, HUD is charged with the duty of creating and publishing the applicable adjustment factors. Wisconsin Housing had no role in setting the adjustment rates and no discretion to override HUD's published

numbers. The district court concluded that Wisconsin Housing's reliance on HUD's published table for non-turnover units was not only permissible, it was obligatory under the language of the contracts. District courts deciding whether a state housing agency breached a HAP contract by applying the one percent reduction for non-turnover units have uniformly rejected the property owners' claims. *Cathedral Square Partners Ltd. P'ship v. South Dakota Housing Dev. Auth.*, 2011 WL 43019, *14–*18 (D.S.D. Jan. 5, 2011); *Greenleaf L.P. v. Illinois Housing Dev. Auth.*, 2010 WL 3894126, *6–*8 (N. D. Ill. Sept. 30, 2010). The only courts to hold to the contrary involved HUD as the defendant in the breach of contract case. *Haddon*, 711 F.3d at 1336;[8] *Statesman II Apartments, Inc. v. United States*, 66 Fed.Cl. 608, 625 (2005). In essence, the district court concluded that the Owners sued the wrong party when they took aim against Wisconsin Housing rather than HUD. Wisconsin Housing could not be held liable for breach because the Authority was simply complying with federal mandates enacted by HUD. In any case, though, because the Owners' HAP contracts were renewed after Congress amended Section 8 to reflect the one percent reduction, the amendments became part of the contracts. Enforcement of the one percent statutory mandate could not constitute a breach of contract under those circumstances.

## III.

In sum, Washington Square was not excused from complying with the HAP contract condition precedent requiring it to

---

**8.** We note again that *Haddon* is further distinguishable because the HAP contract was executed in 1981 for a thirty-year term. Congress amended Section 8 during the term of the contract to require the one percent reduction for non-turnover units, changing the terms of

the deal in the middle of the contract term. In the instant case, the contracts were renewed after Congress amended the statute, and the amendments were thereby swept into the contracts.

request a rent increase. The doctrine of disproportionate forfeiture simply does not apply under these facts. Moreover, Wisconsin Housing did not breach any HAP contracts by requiring rent comparability studies in certain circumstances or by applying a one percent reduction for non-turnover units. In each instance, the Owners' contracts were renewed after Congress amended Section 8 to include these provisions, and the provisions became part of the new contracts. Because the Owners' primary claims fail, we agree with the district court that the third-party claims against HUD are moot.

AFFIRMED.

